**NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL–CIO, et al., Plaintiffs,**

**v.**

**UNITED STATES CIVIL SERVICE COMMISSION et al., Defendants.**

**Civ. A. No. 577–71.**

United States District Court, District of Columbia.

July 31, 1972.

Thomas C. Matthews, Jr., Washington, D. C., for plaintiffs.

David Anderson, Dept. of Justice, for defendants.

Before MacKINNON, Circuit Judge and GESELL and PARKER, District Judges.

## OPINION AND ORDER

GESELL, District Judge:

The National Association of Letter Carriers and six federal employees have brought this class action on behalf of all federal employees seeking a declaratory judgment that 5 U.S.C. § 7324 (a) (2), the provision of the so-called Hatch Act which prohibits certain federal employees from taking "an active part in political management or in political campaigns," is unconstitutional.[1] In urging that enforcement of the challenged provisions be enjoined, plaintiffs assert that the Act is vague, overly broad, and in conflict with the First Amendment to the Constitution of the United States. Defendants are the Civil Service Commission, its three members, and the Secretary of Health, Education and Welfare. Finding the question substantial in the light of current constitutional doctrine, this three-judge court was convened pursuant to 28 U.S.C. §§ 2282 and 2284. A voluminous record was developed by stipulation, some testimony was taken, and the issues have been fully briefed and argued.

There is an obvious, well-established governmental interest in restricting political activities by federal employees which was asserted long before enactment of the Hatch Act. Many federal employees have been prevented from running for political office and engaging in the more obvious forms of partisan political activity since the passage of the Civil Service Act in 1883.[2]

The Hatch Act provides in pertinent part that any employee of an Executive agency or an employee of the District of Columbia may not take an active part in political management or political cam-

---

1. The National Association of Letter Carriers and six federal employees are adequate representatives of the class of all *federal* employees affected by the Hatch Act, and this particular class is thus certified under Rules 23(b) (1) and (b) (2) of the Federal Rules of Civil Procedure. On the other hand, six local area Democratic and Republican political committees were also joined as plaintiffs and seek to broaden the scope of this action to challenge 5 U.S.C. §§ 1502(a) (3) and 1501 (5) which impose identical restrictions on certain categories of *state* employees. None of the individual plaintiffs or the National Association of Letter Carriers, however, can properly represent the in-

terests of *state* employees under the requirements of Rule 23(a) of the Federal Rules of Civil Procedure, and the record does not establish that the six political committee plaintiffs have within their membership a sufficiently broadly based representation of all *state* employees adequately to protect the diverse and varying interests of state employees covered by § 1502(a) (3). Accordingly, this case will be considered only as it directs a challenge to the restrictions on *federal* employees, 5 U.S.C. § 7324.

2. Since passage of the Civil Service Act in 1883, various Presidents, starting with President Arthur, issued executive rules

paigns of a partisan nature and is subject to removal or suspension without pay for violation. The appropriateness of this governmental objective was recognized by the Supreme Court of the United States when it endorsed the objectives of the Hatch Act. *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947); *cf. Oklahoma v. United States Civil Service Commission,* 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947).

■ A narrower issue, however, is presented here which was specifically left unresolved by *Mitchell.*[3] This litigation focuses not on the merits of the objective of the Hatch Act but on the manner in which Congress defined the conduct it purported to prohibit in the name of "political management or political campaigns." The meaning and effect of the prohibitions measured against First Amendment standards is now properly raised by qualified plaintiffs having a direct interest as a class in the matter, and this admittedly troublesome constitutional issue can no longer be avoided.

Section 15 of the Act here challenged provides:

. . . the phrase "an active part in political management or in political campaigns" means those acts of political management or political campaigning which were prohibited on the part of employees in the competitive service before July 19, 1940, by determinations of the Civil Service Commission under rules prescribed by the President. § 7324(a).

This definition is ambiguous and unsatisfactory. It incorporates by reference over 3,000 rulings made by the Commission between 1886 and 1940. These rulings, which were not before the Congress when the Act was passed, have now been assembled and are in the record of this case.[4] When examined they have a sweep and indefiniteness that no one would even attempt in these days to defend if analyzed against the strictures of the First Amendment. A few examples suffice to make this apparent. Disciplinary action was taken against federal employees in situations where the em-

---

listing restrictions on governmental employees in the federal competitive service which were enforced by the Civil Service Commission. In 1907, President Roosevelt increased the restrictions and required stricter compliance. The Hatch Act, enacted August 2, 1939, ch. 410, 53 Stat. 1147–49, and significantly amended, July 19, 1940, ch. 640, 54 Stat. 767–72, extended the same restrictions, with some exceptions, to all employees in the Executive Department of the Federal Government, all employees of the government of the District of Columbia, and all employees of state or local agencies "whose principal employment is in connection with an activity which is financed in whole or in part by loans or grants made by the United States or a Federal Agency. . . ." 5 U.S.C. §§ 1501(4), 1502, and 7324. See 1 *United States Civil Service Commission Political Activity Reporter* Introduction (1971) [hereafter cited as P.A.R.]; Rose, A Critical Look at the Hatch Act, 75 Harv.Rev. 510 (1962).

3. Justice Reed, speaking for the majority in *Mitchell,* stated,

We need to examine no further *at this time* into the validity of the definition of political activity and § 15. 330 U.S. at 103–104, 67 S.Ct. at 571 (emphasis added; footnote omitted).

And Justice Black in his dissent stated that

Furthermore, what federal employees can or cannot do, consistently with the various civil service regulations, rules, warnings, etc., is a matter of so great uncertainty that no person can even make an intelligent guess. *Id.* at 110, 67 S.Ct. at 574.

4. These incorporated rulings vary from lists of penalized employees, to vague, generic descriptions of the political activity engaged in, to lengthy, narrative descriptions of the activities with a discussion at the end of the penalty received. The complete compilation of these rulings was introduced into the record in this case. For a general index of these rulings, see 1 P.A.R. iii–xxvi (1971).

ployee engaged to some extent in the following:

(1) made a wager on an election;

(2) offensively discussed a "political question";

(3) disparaged the President;

(4) denounced a political party while in a jovial mood due to alcohol;

(5) publicly engaged in a political discussion;

(6) wrote a political letter;

(7) publicly expressed a political opinion;

(8) published a political article;

(9) wore a political button while on duty;

(10) stated unsubstantiated facts about ancestry of a candidate;

(11) made offensive political remarks;

(12) failed to discourage a spouse's political activity;

(13) stated disapproval of treatment of veterans while acting as a Legion officer in a closed Legion meeting;

(14) was partisan in political views;

(15) allowed one's name to be associated with an objectionable political affair;

(16) authored an anonymous political communication.[5]

As if conscious of the latent overbreadth and vagueness of the rulings which were never disclosed in hearings, committee reports or debates, the Act contains a significant qualifying provision which states, "An employee . . . retains the right to vote as he chooses and to express his opinion on political subjects and candidates." 5 U.S.C. § 7324(b). It is immediately unclear how the incorporation by reference and this qualifying provision were intended to operate together. At first glance they appear mutually contradictory. One fixes the definition and the other makes the definition fluid.

The incorporation of prior rulings seems to have been intended in part to serve as a brake on any possible expansion of the meaning of the phrase "an active part in political management or in political campaigns" beyond what was generally understood by that phrase under Commission interpretations as of 1940.[6] The incorporated rulings were

---

5. For specific examples of the categories listed above (using the notation system suggested in 1 P.A.R. i and ii (1971), and with reference to the index, *id.* at iii–xxvi) *see*:

(1) Index #63, Atkins, 31 AR 160;
(2) Index #24, Hiner, 32 AR 141;
(3) Index #24, Dunham, 32 AR 144;
(4) Index #24, Brock, 31 AR 146;
(5) Index #24, Mure, 34 AR 148;
(6) Index #64, Cain, 32 AR 143;
(7) Index #24, Chester, 32 AR 143;
(8) Index #51, Nihart, 32 AR 143;
(9) Index #7, Ratcliffe, 34 AR 144;
(10) Index #54, Smith, 1922 Min. 343;
(11) Index #24, Edmonds, 33 AR 151;
(12) Index #17, Brock, 1935 Min. 209;
(13) Index #25, Davis, 1935 Min. 154;
(14) Index #24, Castleberry, 32 AR 145;
(15) Index #35, Woody, 1933 Min. 670;
(16) Index #9, MacDonald, 1933 Min. 293.

---

6. Section 15 of the Act, as reported out of committee, would have granted rulemaking power to the Commission, but after two weeks of debate, Senator Hatch substituted the provision that was enacted as a floor amendment. The final version was offered at 86 Cong.Rec. 2947 (Mar. 15, 1940). During the debate on the

to serve generally as an upper limit on future interpretations or expansions of previously prohibited political activity. The qualifying provision in section 7324 (b) indicates that they were subject to being cut back or modified in some indefinite way more consistent with the First Amendment "rights" of expression.

The difficulty, however, is that no constitutionally acceptable mechanism was provided for accomplishing this result. Grave ambiguities remain. The defect lies not in the basic underlying purpose to limit certain partisan political activities by federal employees but rather in its drafting. Prohibitions are worded in generalities that lack precision. There is no standard. No one can read the Act and ascertain what it prohibits.[7] Neither the Commission nor any other agency was given rulemaking power. Indeed even those most intimately concerned with its enforcement are in doubt and have sought legislative clarification.[8]

The Commission recently sponsored a three-volume work called the *Political Activities Reporter* (P.A.R.) which catalogues in commendable detail the rulings made under the Act since 1940. Analysis of these rulings shows that the Commission has generally ignored many of its pre-1940 rulings where questioned conduct appears to involve only opinion. Expressions of political opinion have been permitted except when the circumstances shown in a particular disciplinary action support a finding that an opinion on a political question was expressed by the employee with the intent of influencing others.[9] However, putting aside the fact that enforcement of any pre-1940 rulings still remains a threat, the administrative actions of the Civil Service Commission, even if unqualifiedly accepted as the administrative gloss on the Act, still place any federal employee at hazard if he ventures to speak on a political matter since he will

substituted final version, Senator Hatch said that "it seemed to me to be very wise not to give the Commission any more power to interpret further in the future." *Id.* at 2949. *See id.* at 2937–50; 84 Cong.Rec. 9621–9674 (1939); and Rose, A Critical Look at the Hatch Act, *supra* note 2.

7. At several points in the Senate debates it was emphatically pointed out that none of the Senators knew what the incorporated rulings said. 86 Cong.Rec. 2940 (remarks of Senator Minton: "No one on the floor of the Senate, not even the Senator from New Mexico [Senator Hatch], now knows what these rules and regulations are."); *id.* at 2947 (remarks of Senator Brown: "I say it is very careless legislation in effect to write into statute law 62 pages of civil-service rules and interpretations by the Civil Service Commission, without knowing what we are doing.").

8. "Conditions have changed since 1940. The prohibitions imposed prior to that time may not all be valid in light of present circumstances.

"In essence, notwithstanding the present qualifying provision, the present language is somewhat broad and somewhat uncertain. It is broad in the sense that it could be construed to prohibit certain activities that may not be sufficiently detrimental to the neutrality, efficiency or in-

tegrity of the civil service as to justify the infringement of individual political rights. It is uncertain in that it fails to define with clarity and precision the types of activities which are prohibited." Statement of John W. Macy, Jr., Chairman, United States Civil Service Commission before Commission on Political Activity of Government Personnel (CPA) on May 15, 1967, 3 CPA, Report, at 15 (1968). Chairman Macy was accompanied during this testimony by the other two members of the Civil Service Commission and its General Counsel, and at that time the present Chairman expressly endorsed Chairman Macy's statement on behalf of the Commission. *Id.* at 24.

9. *See generally* Commission rulings in 3 P.A.R. Digest (1971), under Digest Nos. 268–270. Two such rulings were Watson, 1 P.A.R. F–1221–48, in which the Digest entry is "Where employee expresses opinions on political subjects or candidates in order to influence actions of voters, such expressions of opinion constitute 'campaigning' within the meaning of the Act," and Wilson, *id.* at F–1530–55, in which the entry is "Test of whether statement is permitted 'expression of opinion' is whether there is a mere expression of opinion, or whether there is a premeditated effort to influence political actions by others."

not know when his words or acts relating to political subjects will offend.

If he writes a letter to a newspaper seeking support for a program endorsed by a political party, such as pollution control, does he intend to influence? How many people can see or hear what he writes or says before an intent to influence by his opinion will be found? Can he respond to a pollster? Can he attend a political rally and sit on the platform where his presence will be noted? If he is a member of a Union, a P–TA, or a fraternal lodge, can he urge the organization to pass a resolution on a political issue? Can he appear on a television panel to discuss a question that for many may have political import? What issues are, after all, political in a campaign year—China, crime in the streets, inflation, foreign aid, national debt? Does intent to influence appear more likely depending on his pay grade, on his title, or on to whom he talks?

Confusion and uncertainty persist under this intent-to-influence formula. Any conscientious public servant concerned for the security of his job and conscious of the latent power in his supervisor to discipline him if he transgresses into areas of questioned conduct must feel continuously in doubt as to what he can do or say politically. The result is unacceptable when measured by the need to eliminate vagueness and overbreadth in the sensitive area of free expression.

The Civil Service Commission has acted responsibly in attempting the impossible task of applying the uncertain and conflicting provisions of the Act. Its efforts, however, were thwarted by the fact that it was given no authority under the Act to accommodate rigidly incorporated prior rulings to the rapidly evolving court interpretations of the First Amendment and the basic inconsistency between prior rulings and, in-terpretations of the constitutional right to state opinion still persists. Congress not only gave insufficient standards but also withheld the authority essential to enable the Commission to create essential clarity out of the general, imprecise prohibition enacted.

The Act is capable of sweeping and uneven application. It is of no consequence that particular prior rulings may be partly ignored by those presently charged with enforcement. Conscientious public servants may still lean over backwards to abide by these dormant rulings, and, in any event, no one can say to what extent interpretations of the Constitution have changed them.[10] Nor is it an answer, as the defendants feebly suggest, that people of common intelligence know what is comprehended by active and partisan political activity. Uncertainties abound and they will produce excessive caution and stifle words and acts not explicitly prohibited. Small wonder that even those concerned with enforcement share the sense of uncertainty and confusion, as the record before us attests.[11] Thus do generalized, vague prohibitions become misunderstood and misapplied and serve to limit expression by millions of Federal Government employees, and even their families, in a society where political speech and uninhibited, robust, wide-open debate on public issues are at the essence of self-government.

Ours is not a form of government that will prosper if citizens, particularly Federal Government servants, must live by the mottoes "better be safe than sorry" and "don't stick your neck out." Government employment should, of course, carry some well-defined limitations upon participation in partisan political matters, but Congress may not by reason of this desirable objective neutralize such a large segment of the populace from expressing any opinion on any "political" issue with the intent of somehow influencing someone else. In the end every-

10. *Cf.* Keyishian v. Board of Regents, 385 U.S. 589, 599–602, 87 S.Ct. 675, 17 L. Ed.2d 629 (1967).

11. *See* note 8 *supra.*

thing may appear political, all speech may intend to influence, and conformity is imposed in the fashion of more regimented, less democratic governments.

■ This is a classic case of a statute which in its application has a "chilling effect" unacceptable under the First Amendment. The use of a shorthand expression such as this in legal terminology sometimes tends to obfuscate the significance of the underlying principle. Commencing around 1940 in a series of important First Amendment cases, the Supreme Court evolved the "chilling effect" doctrine to deal with the vice of overbreadth and attendant vagueness in legislation limiting speech such as that so obviously presented here.[12] It declared that men of common intelligence must not be made to guess at the meaning of a statute affecting these rights. Some activities involving speech and association may be regulated where a proper governmental purpose and definite need is demonstrated. This interference with privileged conduct must be carefully and narrowly drawn. Executive agency employees as citizens are entitled to be specifically informed as to what the Congress intends to forbid.[13] Restrictions may not be achieved by means which sweep unnecessarily broadly into the First Amendment areas.[14] The right and privilege of expression and association cannot be so unnecessarily invaded that the use is dampened and discouraged. To chill is to despirit, and the First Amendment will not flourish but can be gradually suffocated in such an atmosphere.

The Supreme Court of the United States has left no doubt on this score:

We emphasize once again that "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms," . . . "[f]or standards of permissible statutory vagueness are strict in the area of free expression. . . . Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." . . . When one must guess what conduct or utterance may lose him his position, one necessarily will "steer far wider of the unlawful zone. . . ." . . . For "[t]he threat of sanctions may deter . . . almost as potently as the actual application of sanctions." . . . The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed. . . . Keyishian v. Board of Regents of University of State of New York, 385 U.S. 589 at 603–604, 87 S.Ct. 675 at 684, 17 L.Ed. 2d 629 (1967).

No less can be said of Federal Government employees.

The record before this Court emphasizes the growing reach of this Hatch Act legislation which, with the expansion of federal grants to various state services, now encompasses millions of Federal Government employees and their families. It is now obvious that whatever may have been the validity of the

12. Within the past month, the U.S. Supreme Court in Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), succinctly summarized the reach and scope of both the doctrine of vagueness and overbreadth. For a more lengthy discussion of the doctrine of overbreadth, vagueness and chilling effect, *see* Hobbs v. Thompson, 448 F.2d 456, 459–460 (5th Cir. 1971), and cases cited therein.

13. Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ; Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 32 L.Ed.2d 110 (1972) ; Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939).

14. Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ; United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) ; NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

Hatch Act in 1940, it cannot as presently interpreted withstand constitutional challenge under contemporary interpretations of the First Amendment.

Two courts have already recognized the necessity of re-examining the Act in the light of controlling precedents. Hobbs v. Thompson, 448 F.2d 456 (5th Cir. 1971); Mancuso v. Taft, 341 F. Supp. 574 (D.R.I. 1972).[15]

■ Defendants urge that *Mitchell* is binding. As indicated above, this does not appear to be the case since the *Mitchell* opinion explicitly left open the question of the constitutionality of the incorporation-by-reference section of the Act. However, even if *Mitchell's* holding is considered binding, as the defendants contend, it is inconsistent with subsequent decisions delineating First Amendment freedoms. These precedents, which developed the "least restrictive alternative test" for governmental incursions into the area of free speech, undercut the "rational basis" test upon which the *Mitchell* analysis of the Hatch Act was based.[16] The decisions, coupled with changes in the size and complexity of public service, place *Mitchell* among other decisions outmoded by passage of time.

■ It is difficult to declare a statute long on the books and so well motivated unconstitutional. The arguments advanced by the dissent, however, are not persuasive. In the delicate, precious area of free speech, the obligation of the courts to seek all possible, even if somewhat tortured, means to uphold admittedly fuzzy congressional action must give way to other considerations.

■ If the Congress undertakes to circumscribe speech, it cannot pass an act which, like this one, talks in riddles, prohibiting in one breath what it may

be argued to have allowed in another, leaving the citizen unguided but at hazard for his job. Perhaps details could have been left to the administrative discretion, but in this instance the Commission was given no rulemaking power, and the Act itself does not state with any precision what evils it seeks to prevent. Where speech is to be limited, it is no answer, as the dissent suggests, to imply that a reading of the voluminous *Political Activities Reporter* and resort to advisory rulings by the Civil Service Commission will give one who wants to express himself adequate guidance. Speech must not be controlled and subject to censure so that one cannot respond without prior clearance to the demands of free expression in ordinary daily affairs. If there are impermissible areas of activity, the overriding governmental interest must be marked with utmost clarity by the Congress in a form that is obvious to the sophisticated and unsophisticated alike.[17]

Accordingly, the Court declares 5 U.S.C. § 7324(a) (2) of the Hatch Act unconstitutional in that its provisions are impermissibly vague and overbroad when measured against the requirements of the First Amendment to the Constitution. The injunction against enforcement is granted and a stay of this Order is granted pending determination by the Supreme Court of the United States. So ordered.

PARKER, J., concurs in this opinion and reserves the right to file a separate concurring opinion.

MacKINNON, Circuit Judge (dissenting):

This case is brought by the National Association of Letter Carriers, six local Democratic and Republican Committees,

---

15. *Contra,* Northern Va. Regional Park Auth. v. United States Civ.Serv.Com., 437 F.2d 1346 (4th Cir.), cert. denied, 403 U.S. 936, 91 S.Ct. 2254, 29 L.Ed.2d 717 (1971), and the four cases cited therein at 1351. *See also* Broadrick v. Oklahoma ex rel. Okla. State Person. Bd., 338 F.Supp. 711 (W.D.Okla., 1972).

16. Hobbs v. Thompson, 448 F.2d 456 (5th Cir. 1971); Mancuso v. Taft, 341 F.Supp. 574 (D.R.I.1972).

17. *See* cases cited notes 13 and 14 *supra.*

and six individually named federal employees [1] as a class action on behalf of all federal and state employees covered by the political management and campaigning provisions of the Hatch Act.[2] They seek a declaratory judgment that because Section 15 of the Act,[3] defining the prohibited activity of "taking any active part in political management or in political campaigns," is unconstitutional for overbreadth and vagueness, the prohibitions of such activities are themselves constitutionally invalid.[4] They also seek to enjoin the United

1. The political committee plaintiffs are the Democratic Committees of Arlington and Fairfax Counties in Virginia and Montgomery and Prince Georges Counties in Maryland, the District of Columbia Democratic Central Committee, and the Republican Central Committee for Montgomery County, Maryland. The individual plaintiffs are J. Price Gee and Charles O. Myers, both letter carriers in the United States Postal Service and members of the plaintiff Union; John O. Hummel, an executive officer in the Internal Revenue Service and a resident of Arlington, Virginia; Frank Mandicino, Jr., an Assistant Regional Field Director in the U. S. Postal Service and a member of the Executive Board of the plaintiff Union; Marie Pinho, a Systems Analyst in the National Library of Medicine and an aspirant to the post of precinct Committee Woman in the plaintiff Arlington County Democratic Committee; and Ronald J. Wylie, Director, Political and Legal Analysis Branch, National Center for Health Services Research and Development, Department of Health, Education and Welfare, and a resident of Montgomery County, Maryland and aspirant to the Republican nomination to the Maryland State Senate. I find that Mandicino, Wylie and Myers each present a case or controversy and give us jurisdiction. The claims presented by Gee and Pinho are less immediate. I find that Hummel does not present a case or controversy.

2. Originally enacted August 2, 1939, ch. 410, 53 Stat. 1147–49, the Hatch Act was amended significantly on July 19, 1940, ch. 640, 54 Stat. 767–72. The various provisions of the Act have since been incorporated at scattered locations in Title 5, United States Code, and were enacted into positive law in that form upon the formal codification of Title 5 by Pub.L. 89–554, § 1, September 6, 1966, 80 Stat. 378 et seq.

3. Section 15 was added by the 1940 amendments to the Act, 54 Stat. 771, and provided:

The provisions of this Act which prohibit persons to whom such provisions apply from taking any active part in political management or in political campaigns shall be deemed to prohibit the same activities on the part of such persons as the United States Civil Service Commission has heretofore determined are at the time this section takes effect prohibited on the part of employees in the classified civil service of the United States by the provisions of the civil-service rules prohibiting such employees from taking any active part in political management or in political campaigns.

In this form Section 15 applied to both federal employees and to those state employees brought within the coverage of the Act by the 1940 amendment.

As it is now codified, the former Section 15 appears both as 5 U.S.C. § 1501 (5) (1970), applying to covered state employees, and as the last sentence of 5 U.S.C. § 7324(a) (2) (1970), applying to federal employees. The operative language of both sections is the same:

the phrase "an active part in political management or in political campaigns" means those acts of political management or political campaigning which were prohibited on the part of employees in the competitive service before July 19, 1940, by determinations of the Civil Service Commission under the rules prescribed by the President.

4. Thus, their prayer for relief asks that: "This Court declare the provisions of law 5 U.S.C. 1502(a) (3) and 7324(a) (2) to be unconstitutional, invalid and void . . . ." Complaint, at 13. The first of these sections is the statutory prohibition as it applies to state employees:

(a) A State or local officer or employee may not—
    *       *       *       *       *
(3) take an active part in political management or in political campaigns.

The second contains both the prohibition and the definition, but construing the complaint so that the two requests are consistent with one another we consider that it is the prohibition that plaintiffs seek to have declared invalid:

(a) An employee in an Executive agency or an individual employed by the

States Civil Service Commission and its individual members, and the Secretary of Health, Education and Welfare, from enforcing or threatening to enforce the challenged portions of the Act.[5] This three-judge court was convened pursuant to 28 U.S.C. §§ 2282 & 2284 to hear the case. After consideration of a voluminous documentary record and after hearing oral argument from the parties, it is my opinion that there is no constitutional defect in the challenged statutes.

## I

At the outset it is noted that the two statutes the complaint here asks us to invalidate, 5 U.S.C. §§ 7324(a) (2) and 1502(a) (3), are respectively, the direct successors of Sections 9 and 12 of the Hatch Act (as amended in 1940). These two provisions were found to be constitutionally valid by the Supreme Court in United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), and Oklahoma v. United States Civil Service Commission, 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947), respectively. In those cases essentially all the same issues here presented were decided adversely to the present opponents of the Act. In addition, in the intervening years the number of Government employees has materially increased and thus the threat to a democratic society and to an efficient public service has increased proportionately. It is accordingly beyond the power of this court to consider the plaintiffs' challenge to the constitutionality of the statutory prohibitions against "taking an active part in political management or in political campaigns."

However, despite the apparent specificity of the complaint, it has been clear throughout this litigation that the plaintiffs concede the validity of the governmental interest in prohibiting certain blatant forms of electioneering and politicking on the part of federal and state employees. Their concern, rather, has been with the scope of the prohibition as reflected by Section 15's definition of prohibited activities. They contend that since the Court in *Mitchell* found that Mr. Poole's actions fell squarely within the reach of Section 9, they expressly declined to examine the constitutional limits of the Section 15 definition of prohibited political activity,[6] and that this issue is open. This overlooks the fact that the majority opinion in *Mitchell, supra,* which sought injunctive and declaratory relief, generally upheld the Act against the contentions raised after discussing the background and reasons for its enactment:

> The Hatch Act is the answer of Congress to this need. We cannot say with such a background that these restrictions are unconstitutional.

government of the District of Columbia may not—

\*    \*    \*    \*    \*

(2) take an active part in political management or in political campaigns. For the purpose of this subsection, the phrase "an active part in political management or in political campaigns" means those acts of political management or political campaigning which were prohibited on the part of employees in the competitive service before July 19, 1940, by determinations of the Civil Service Commission under the rules prescribed by the President.

5. In what must surely have been a typographical error the complaint requests injunctive relief against the enforcement of *all* of § 1502(a): "That each and all of the defendants be preliminarily and permanently enjoined from enforcing or executing or threatening enforcement of [*sic*] execution of the provisions of 5 U.S.C. 1502(a) [*sic*] and 7324(a) (2) . . . ." Complaint, at 14. This, too, we construe consistently with the prayer for declaratory relief to intend a request to enjoin enforcement of only § 1502(a) (3) and the prohibition portion of § 7324(a) (2).

6. 330 U.S. at 103–104, 67 S.Ct. at 571: "We need to examine no further at this time into the validity of the definition of political activity and § 15." Mr. Paris' chairmanship of the Democratic State Central Committee, in the *Oklahoma* case, was even more obviously in violation of Section 12 than Mr. Poole's activities, so that the Section 15 definition was not even remotely under attack in that case.

330 U.S. at 103, 67 S.Ct. at 571. In addition the opinion held that the specific provisions which circumscribed Poole's (the plaintiff-employee) conduct were valid. This portion of the opinion also implicitly upheld the *manner* in which specific prohibitions against certain employee activities had been promulgated through Form 1236, September, 1939.

However, plaintiffs contend that the validity of the definition in Section 15 was left open for decision by the *Mitchell* and *Oklahoma* cases, and it is solely to consider plaintiffs' challenge to that definition that we have retained jurisdiction as a three-judge court over this case.

## II

Federal Rule of Civil Procedure 23(c) requires consideration of the class aspects of the complaint. Plaintiffs assert that the class they represent is "all federal and state employees covered by [5 U.S.C. §§ 1502(a) (3) and 7324(a) (2)] who presently desire or will in the future desire to engage in activities which are or may be in violation of said provisions." Complaint, ¶ 14. This claim to representation is far too broad.

I do not find that the class of state employees is properly represented by these plaintiffs. To begin, no member of this class is before the court. None of the named individuals is a state employee. The National Association of Letter Carriers represents only federally employed Postal Service workers. Only the politi-

cal committees have even a plausible claim for representation of state employees. I thus consider this claim to be too remote to meet the requirements of Rule 23(a). Examination of the committees' allegation of injury in the complaint [7] reveals that their interest in this litigation is purely an institutional interest—they allege that their organizations are deprived of the services of governmental employees as potential candidates, party workers, and financial contributors. Though there is no question that the committees are entitled to participate in this action on their own behalf,[8] it seems clear to me that their interest in this litigation is separate and distinct from the individual employees' allegations of infringement of their First Amendment rights to freedom of expression of political views. Thus it is not clear that, in the terms of Rule 23(a) (4), "the representative [committees] will fairly and adequately protect the interests of the class [of state employees]." Furthermore, though the legal theories that would entitle the committees to relief are in many respects likely to be the same as would be argued by individual state employees or an organization whose membership or other status was more directly representative of that class, it is not readily apparent that the Rule 23(a) (3) requirement that "the claims . . . of the representative [committees] are typical of the claims . . . of the class" has been met here. Since the committees do not meet these require-

---

7. Paragraph 19 of the Complaint alleges: Plaintiff Democratic and Republican Committees have been and continue to be severely and adversely affected and disadvantaged by the enforcement and threats of enforcement of the political management and political campaiging provision of the Hatch Act against federal and state employees. In particular, Plaintiff Committees have been deterred and continue to be deterred from seeking desirable candidates who are Federal or state employees covered by the Hatch Act to run on the Democratic or Republican ticket for state and local offices. In addition, numerous individuals who would otherwise desire and be available to become members of Plaintiff Committees have been and continue to be deterred from doing so by said provisions of the Hatch Act. The general atmosphere of superstition and fear created by the political management and political campaigning provision of the Hatch Act has severely hindered Plaintiff Committees in their important responsibilities for fund raising and getting out the vote by deterring individuals from participating in political activities of any kind, including political donations and voting.

8. *See, e. g.,* Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 157–160, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).

ments, and since no other plaintiffs claim to represent the class, I find that the case cannot be maintained as a class action with regard to the class of state employees covered by the Hatch Act.[9]

As to the class of all federal employees covered by the Hatch Act, I find that a class action is properly maintainable here. Though there are but a few individuals and one union (with approximately 200,000 postal employee-members) representing the nearly 2.9 million civilian employees of the Federal Government, most of whom are covered by the Act, there is not present the potential conflicts of representational interest noted with regard to state employees. *See* note 9, *supra,* and accompanying text. The requirements of Rule 23(a) are thus fully met by these representatives. The defendant Civil Service Commission has admitted that it has enforced and will continue to enforce the provisions of the Hatch Act, including the political management and campaigning provisions, against those employees subject to its terms. Answer, ¶¶ 16, 17. This admission meets the requirements of Rule 23(b) (2), thus completing the Rule's pre-requisites for maintenance of a class action.

## III

It is my finding, however, that this case is maintainable as a class action only with regard to the class of federal employees subject to the Hatch Act. My reason for denying class status to the parties seeking to represent state employees was my concern that those parties' interests are not closely enough aligned with the prospective class members' interests to provide adequate representation. Therefore I limit my inquiry in this action to examining the constitutional validity of the definition of that political activity prohibited to federal employees in 5 U.S.C. § 7324(a) (2). Plaintiffs challenge this definition on grounds of overbreadth and vagueness, and though these concepts are closely related they are sufficiently distinct to warrant separate analysis.

### A. *Overbreadth*

The essence of the concept of overbreadth is that the challenged statute includes within its prohibitions both legal and illegal activity.[10] Overbreadth contentions are frequently combined, as here, with allegations of First Amendment violations—that the statute's overbreadth consists of prohibiting, *inter*

9. Since the statutory language applicable to state and federal employees is identical, why, it might be asked, aren't the federal employee representatives adequate representatives of the class of state employees despite their failure to so allege in the complaint? Though *Mitchell* and *Oklahoma* are dispositive on the question of the constitutional propriety of the governmental interest in prohibiting political activity on the part of both . state and federal employees, what is present here is a challenge to the scope so that prohibition as reflected by the statute's definition of the prohibited activity. It is conceded that any regulation in this area infringes on First Amendment rights, so that the validity of the prohibition depends in large part on the Government's showing a compelling necessity for the statute. It seems at least feasible to me that the interest of the Federal Government in regulating in this area might differ with respect to federal and state employees—that the

Federal interest in maintaining "the effectiveness, integrity and impartiality of the Federal Civil Service" (Defendants closing brief, at 6) might justify a prohibition broader in scope than the Federal interest in regulating those individuals within a state or local governmental unit's Civil Service whose positions are funded principally by Federal payments. While I intend to express no opinion on this subject here, I consider the possibility of such an argument to be a convincing reason for insisting that the state employees' interests be presented by a more representative individual or group than these federal employees and the Letter Carriers union.

10. *See* Coates v. City of Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971); Street v. New York, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969); United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

*alia*, activities protected by the First Amendment. Here, plaintiffs argue that by incorporating the Civil Service Commission's pre-1940 decisions interpreting and applying the Commission's rule prohibiting political management and campaigning, the statute defines as impermissible many such political activities that fall squarely within the First Amendment's guarantee of "the opportunity for free political discussion . . ., an opportunity essential to the security of the Republic, [and] a fundamental principle of our constitutional system." Stromberg v. California, 283 U.S. 359, 369, 51 S.Ct. 532, 536, 76 L.Ed. 1117 (1931).[11]

The critical assumption underlying the plaintiffs' argument is that in enacting Section 15 Congress intended to immutably fix the definition of prohibited political activity as those acts which the Commission, in their decisions and interpretations prior to 1940, had found violative of former Civil Service rules. Plaintiffs contend that some of these prior determinations would violate current concepts of the First Amendment's protections,[12] and that their incorporation into the statute's definition of prohibited activity is fatally defective to the entire definition.

With this assumption plaintiffs seek to compel a rigidity in Section 15's definition analogous to the laws of the Medes and Persians. This rigid literalness has no place in the interpretation of statutes and has long since and continuously been rejected by our Supreme Court.

All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter.

Holy Trinity Church v. United States, 143 U.S. 457, 461, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892).

[I]n construing a statute we are not always confined to a literal reading, and may consider its object and purpose, the things with which it is dealing, and the condition of affairs which led to its enactment so as to effectuate rather than destroy the spirit and force of the law which the legislature intended to enact.

American Tobacco Company v. Werckmeister, 207 U.S. 284, 293, 28 S.Ct. 72, 74, 52 L.Ed. 208 (1907).

The strict letter of an act must . . . yield to its evident spirit and purpose, when this is necessary to give effect to the intent of Congress. . . . And unjust or absurd consequences are, if possible, to be avoided.

Fleischmann Construction Company v. United States to Use of Forsberg, 270 U.S. 349, 360, 46 S.Ct. 284, 289, 70 L.Ed. 624 (1926).

However well these rules [of statutory construction] may serve at times to aid in deciphering legislative intent, they long have been subordinated to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the

---

11. *See* Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed. 2d 1498 (1957): "The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people."; New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L. Ed.2d 686 (1964): "Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . ."; Brennan, The Supreme Court and the Meikeljohn Interpretation of the First Amendment, 79 Harv.L.Rev. 1 (1965).

12. *See* Affidavit of Anthony L. Mondello, General Counsel, United States Civil Service Commission, at 3–4 (hereafter cited as Mondello affidavit).

meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy.

SEC v. C. M. Joiner Leasing Corporation, 320 U.S. 344, 350–351, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943).

> Statutory interpretation requires more than concentration upon isolated words; rather, consideration must be given to the total corpus of pertinent law and the policies that inspired ostensibly inconsistent provisions.

Boys Markets, Inc. v. Retail Clerks Union, 398 U.S. 235, 250, 90 S.Ct. 1583, 1592, 26 L.Ed.2d 199 (1970).

Another long-familiar doctrine of our judicial system is that:

> When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.

Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932)[13] Following plaintiffs' construction of Section 15 would lead to injustice, oppression, absurd consequences and possible unconstitutionality, and I find nothing in the legislative history of the provision to suggest that such results were intended by the Congress. Moreover, plaintiffs fail to recognize that, notwithstanding the reference to the pre-1940 determinations, the provisions of the Hatch Act themselves, to the extent that they differ from the law and rules under which those determinations were made, indicate that Congress did not intend to incorporate many of those decisions.

Consider initially the inherent absurdity of plaintiffs' position with regard to the incorporation of those pre-1940 decisions interpreting the earlier Civil Service Rule prohibiting both partisan and nonpartisan political activity and all but *private* expression of personal political views. The Hatch Act, as amended in 1940, explicitly provided for federal employee participation in nonpartisan political campaigns and dropped the provision of the former Rule prohibiting all but private expression of political opinion.[14] Plaintiffs' argument that all of the pre-1940 decisions were fixed in the definition of prohibited activity would create the absurdity that activities specifically exempted from the Hatch Act in Sections 9(a) and 18 were, at the same time, prohibited by Section 15. Such a construction is not tenable.

Similarly, in compiling the index to the pre-1940 decisions that is contained in the Commission's Political Activity Reporter,[15] the Commission noted:

> In many cases decided in the 1886–1940 period, and particularly in cases found in the Annual Reports, the decision did not specify the type of political activity involved. Because the precedent value of such cases is negligible, they have been omitted from the listing set out below.[16]

These are largely cases in which the entire recorded decision contains nothing more than a recitation that some named individual was disciplined for, e. g., "undue political activity," or "corrupt practices." It should hardly be necessary to state that such incomplete decisions are of absolutely no value in elucidating the statute's definition of prohibited political management or campaigning. It would again create an absurd conse-

---

13. *See, e. g.*, United States v. Thirty-seven (37) Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); Schneider v. Smith, 390 U.S. 17, 27, 88 S.Ct. 682, 19 L.Ed.2d 799 (1968); United States v. Rumely, 345 U.S. 41, 45, 73 S.Ct. 543, 97 L.Ed. 770 (1953); Ashwander v. TVA, 297 U.S. 288, 348, 56 S. Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

14. Sections 9(a) and 18 of the Act, 5 U.S.C. §§ 7324(b), 7326 (1970).

15. I United States Civil Service Commission, Political Activity Reporter i–xxvi (1971).

16. *Id.* at i.

quence to hold, as the plaintiffs contend, that all these decisions with no precedential value are incorporated in Section 15's definition. Obviously Congress did not so intend.

Plaintiffs seek to demonstrate that Section 15 was expressly intended to fix the definition in terms of the pre-1940 decisions through quotations from the Senate debates accompanying Section 15's inclusion in the 1940 amendments to the Act.[17] Yet the quotations they use are almost exclusively the biased, self-serving declarations of the bill's bitterest critics. Viewed in the context of the entire history of Section 15, and the traditional doctrines of statutory incorporation by reference, I find no such intent to create a definition wholly inflexible and immune from the normal processes of administrative and judicial interpretation which would ensure conformance with subsequent court decisions, particularly those interpreting the Constitution.

As the bill was reported to the Senate from its Committee on Privileges and Elections, the 1940 Amendments to the Act contained a Section 15 which would have authorized the Civil Service Commission to define the term "active part in political management or in political campaigns" through issuance of rules and regulations that could also subsequently be modified by the Commission. During the ensuing two weeks of debate on the Senate floor, Section 15 was bitterly assailed on two grounds: that it was an unconstitutional delegation of the congressional power to define the activities prohibited by the Act,[18] and the fear

that the Commission's over-zealous efforts to obtain political neutrality in the Civil Service might result in rules and regulations that would infringe on fundamental personal liberties.[19] The opposition thus sought a congressional statement of the prohibited activities rather than delegation of the defining power, and a limitation on the Commission's power to curtail individual freedoms through its interpretations of the Act.

Senator Hatch offered as a substitute to the Committee's Section 15 the section in substantially the same form as it was enacted.[20] Having been offered, and subsequently adopted, in response to the strong opposition to the Committee's Section 15, we can assume that it was intended to meet the two-pronged objections to the former version. Thus Section 15 as enacted does not delegate to the Commission the congressional power to define prohibited activities; but it does expand Congress' definition— through the common legislative technique of incorporation by reference [21] —to encompass both the statute and the refinements thereof that may be evidenced by any pre-1940 determinations interpreting post-1940 relevant statutory language. By that technique, the Commission's powers of interpretation were fixed within more precise limits. However, I do not conceive that the result was an immutable fixing of the definition but rather it amounted to the imposition of a ceiling on the Commission's power to restrict individual political activity. The amended section met the fears of the opposition that the Commission might curtail personal liberties

---

17. This argument ignores somewhat the fact that the House of Representatives plays an equal part in the enactment of legislation.

18. See, e. g., 86 Cong.Rec. 2924–27 (remarks of Senator Thomas).

19. See, e. g., id. at 2922 (remarks of Senator Brown):
    I am unwilling to authorize the Civil Service Commission to make rules of any character which would contravene the right of free speech and which would

prevent the making of voluntary contributions. I am not sure that they would make any change, but I think we ought to state what we want done in that respect. See also remarks of Senator McKellar, id. at 2352.

20. Id. at 2928.

21. See generally 82 C.J.S. Statutes §§ 371– 373 (1953); 2 Sutherland, Statutory Construction §§ 5207–09 (3d ed. Horack, 1943).

through progressively more restrictive regulations by imposing the existing interpretations as a limit beyond which the Commission could not go. I find no reason to construe this concern with the protection of individual freedom as an intent to prevent the Commission from acknowledging current Supreme Court decisions on First Amendment rights by receding from the outer limits of the restrictions set in the Act. The determinations which were incorporated by reference are subject to administrative and judicial interpretation the same as though they were statutes.

This view of Section 15 is fully consistent with traditional doctrines of statutory incorporation by reference.[22] Where a statute of one jurisdiction has been adopted by reference by the legislature of another jurisdiction, the general rule of construction within the adopting jurisdiction, *even in the absence of a statutory declaration,* is that the statute is presumed to have been adopted with the construction placed on it by the courts of the originating jurisdiction. Two exceptions to this general rule are useful for understanding and interpreting Section 15. First, though they are generally accorded great weight in construing incorporated statutes, rulings of administrative bodies in the originating jurisdiction are not considered binding in the adopting jurisdiction. Second, where by its terms the adopting statute is inconsistent with the incorporated statute or judicial constructions thereof, or where constitutional or other major public policies of the incorporating jurisdiction so conflict, the prior constructions give way to the conflicting expressions of the statute or the adopting jurisdiction's policies.

Section 9 of the Hatch Act is in major respects an adoption of former Civil Service Commission Rule One and an incorporation by reference of the applicable decisions interpreting its provisions. The Act came into being in response to various election abuses in the 1938 campaign involving federal employees that were not within the jurisdiction of the Commission. Section 9 incorporated Rule One, with some modifications,[23] as a general statute govern-

22. *Id.*

23. The principal modifications in Section 9, as enacted, included the extension of coverage to virtually all federal employees, permission to *publicly* express political opinions, and creation of an express penalty for violation thereof. At the time the Act was enacted, Civil Service Rule One, § 1, read as follows:

No person in the executive civil service shall use his official authority or influence for the purpose of interfering with an election or affecting the results thereof. Persons who by the provisions of these rules are in the competitive classified service, while retaining the right to vote as they please and to express *privately* their opinions on all political subjects, shall take no active part in political management or in political campaigns. [Emphasis added.]
Section 9, as enacted, provided:
(a) It shall be unlawful for any person employed in the executive branch of the Federal Government, or any agency or department thereof, to use his official authority or influence for the purpose of interfering with an election or affecting the result thereof. No officer or employee in the executive branch of the Federal Government, or any agency of department thereof, shall take any active part in political management or in political campaigns. All such persons shall retain the right to vote as they may choose and to express their [the word "privately" was not included here] opinions on all political subjects. For the purposes of this section the term "officer" or "employee" shall not be construed to include (1) the President and Vice President of the United States; (2) persons whose compensation is paid from the appropriation for the office of the President; (3) heads and assistant heads of executive departments; (4) officers who are appointed by the President, by and with the advice and consent of the Senate, and who determine policies to be pursued by the United States in its relations with foreign powers or in the Nation-wide administration of Federal laws.
(b) Any person violating the provisions of this section shall be immediately removed from the position or office held by him, and thereafter no part of the

ing virtually all federal employees. As Senator Hatch noted during the debate on Section 15 the following year:

> We have adopted the civil-service rules, and, under a well-known rule of law, when we adopt, for instance, the statute of .a sister State, we adopt the construction the courts have placed on that statute.

86 Cong.Rec. 2949. Thus the incorporation of the pre-1940 Commission determinations in Section 15 was, in practical effect, little more than a statutory recognition of this traditional canon of statutory interpretation. It did, however, conclusively avoid the problem that might have been posed by the exception limiting the precedential effect of administrative decisions.

More significantly, the statute which was enacted—the Hatch Act—was inconsistent with Rule One in the respects noted above. Thus the second exception to the general rule would clearly call for ignoring all those pre-1940 interpretive decisions which interpreted those provisions of Rule One which were inconsistent with the terms of the Hatch Act. Similarly, the First Amendment is obviously both a constitutional provision and a vitally important public policy of our government and the teaching of the doctrine of incorporation by reference is that where such concepts conflict with the prior constructions those prior constructions must give way. Finally, the doctrine also acknowledges that subsequent growth and modification of such important policies should result in overruling inconsistent prior constructions from the originating jurisdiction. I consider that Senator Hatch's explicit reference to these "well-known rule[s] of law" reflects a recognition by Congress

that the pre-1940 decisions which were incorporated in Section 15 should be treated no differently than any other decisions which have been incorporated in a statute by reference. The interpretation of Section 15 for which plaintiffs contend is wholly inconsistent with this established doctrine and in my opinion is an improper view of the statute.

Without plaintiffs' assumption regarding the immutability of Section 15's definition by incorporation, their overbreadth argument must fall. As I read Section 15, it incorporates as the Act's definition of prohibited political activity only those pre-1940 decisions which: (1) are sufficiently descriptive to serve as meaningful precedents, (2) are not inconsistent with the express provisions of other portions of the Hatch Act, and (3) which remain consistent with evolving concepts of individual freedom of political expression protected by the First Amendment, as announced by the courts.

This is not to say that the full scope of the First Amendment's protections are guaranteed to federal employees— for as *Mitchell* recognized substantial restrictions are concededly necessary to effectuate the Act's valid objectives of maintaining the integrity and impartiality of the Federal Civil Service. I would hold that in applying the pre-1940 precedents (and the post-1940 successor decisions that have built up from these earlier interpretations) the Commission cannot blindly rely on their continuing vitality. Instead, these decisions are the same as any statutes, subject to continuing administrative and judicial scrutiny to determine whether they are being applied in individual cases in conformance with the terms of the Act itself, the First Amendment, and other applicable constitutional principles. In my view

---

funds appropriated by any Act of Congress for such position or office shall be used to pay the compensation of such person.

The 1940 amendments to the Act added three additional modifications of Rule One: further extension of the Act's coverage to state employees whose positions are principally funded by federal pay-

ments (Section 12); an express exemption from both Sections 9 and 12 for participation in nonpartisan political campaigns (Section 18); and an express grant of permission to participate in political management or campaigning in local elections in areas where the majority of the voters are federal employees (Section 16).

this construction of Section 15 is consistent both with the legislative history and intent behind its passage, and with the traditional doctrine of incorporation by reference. Furthermore, I find that Section 15, as so construed, is not subject to constitutional criticism for overbreadth.

### B. *Vagueness*

Thus I find that Section 15 and the decisions it incorporates by reference may be administered and interpreted the same as any statute. I believe that Congress intended so and that the Commission erroneously reached a contrary conclusion. This brings me to the problem of vagueness. If the definition of prohibited political activity is not absolutely fixed in terms of the pre-1940 Commission decisions, does the statute provide an ascertainable standard of conduct clear enough to inform a reasonable federal employee desiring to participate in the political process of what conduct is forbidden to him?

Both the proponents and opponents of Section 15 in the Senate were painfully aware of the difficulty of finding an adequate definition of the behavior they sought to proscribe.[24] Amendments seeking to enumerate specified categories of political activity were resisted largely on the basis that:

> Congress has never attempted in any of its civil-service laws to define what is pernicious political activity, for the situations are so variable, the facts are

so different. Rarely, if ever, are the facts in two cases precisely alike. So I do not know how far Congress could go, or how wise it would be for Congress to define what is pernicious political activity. . . . This is such a flexible term, depending on the facts of each case, that I believe Congress by undertaking to include certain things, might not include many other things which ought to be included, simply because of inability to think of all of them at once.[25]

Rather than try "to think of all of them at once" Congress turned to the body of decisional law developed by the Civil Service Commission in over 50 years of practice with rules essentially identical to those adopted by the Act. Having incorporated in the Act the Civil Service Rule One prohibition against taking "an active part in political management or in political campaigns," Congress then explicitly adopted—by incorporation— the Commission's decisional construction of that phrase instead of coining an independent definition. As I have indicated above, there is nothing inherently improper about this legislative technique of incorporation by reference.

The statutory standard here is in many respects analogous to a legislature's adoption of a criminal statute against such a common law crime as fraud—no attempt is made to define "fraud"; rather the long-existent body of judicial interpretations of the concept of fraud are impliedly incorporated.[26] The ques-

---

24. Indeed the Committee version of Section 15 had abandoned the attempt and would have delegated to the Commission the sole power to define the phrase "an active part in political management or in political campaigns." Senator Brown, the most vocal of Section 15's opponents, upon offering an amendment in substitute of Section 15, remarked:

> The amendment arises out of my desire to attempt to define, if I possibly can, what is political activity. I drew a long amendment on that subject, and I became dissatisfied with it. Like [Senator Hatch], I find it most difficult to define "political activity"
> . . . .

86 Cong.Rec. 2922.

25. *Id.* at 2952 (remarks of Senator Barkley).

26. The fraud analogy was suggested during the debate on Section 15 in this colloquy between Senators Brown and George:

> Mr. BROWN. Now, let me read to the Senator what the Civil Service Commission said:
> Definition of political activity: It is impossible to give a complete list of the particular activities in which an employee may not engage.
> Mr. GEORGE. Why, certainly it is, just as the courts throughout the ages have refused to define fraud, because they could not imagine every conceivable circumstance under which a practice

tion is whether the resulting statute avoids the vice of vagueness. In a case such as this, the vagueness issue turns on whether the federal employee subject to the Act has been given adequate notice of what activities he must abjure in order to avoid violating the Act.[27] Such clear warning is necessary, particularly when legislating in the area of First Amendment protections, so that the employee is not prevented from participating in protected activities for fear of violating a prohibition whose boundary is not readily discernible.[28]

Since notice is the key to vagueness here, I consider highly relevant the availability of extrinsic aids to the interpretation of the statute.[29] Foremost among such extrinsic aids is the Commission's own digest and summary of the activities they have found to violate the political activity prohibitions. It is clear beyond question that Congress relied heavily on such summaries of the Com-

mission's pre-1940 practice under Rule One when enacting Section 15. Senator Hatch had prepared a post-card size listing of the eighteen principal activities prohibited under Rule One that was widely distributed prior to consideration of the Hatch Act itself in 1939. This card was read into the Congressional Record during the Senate's floor debate on Section 15 the following year.[30] In addition, the substantive portions of the Commission's Form 1236, Political Activities and Political Assessments of Federal Officeholders and Employees, were discussed and later inserted into the Record.[31] It is, of course, true that Section 15 incorporated the decisions themselves and not Form 1236's summary of their holdings, but the legislative history makes it apparent that we can look to Form 1236 for evidence of the congressional understanding of the content of those decisions and in construing their intent in enacting Sec-

would be fraudulent or in good faith. They knew very well that when they did define it, those who wanted to defraud would take advantage of the definition and get around it; so the courts have always said that no absolute, rigid, exhaustive, and exclusive definition of fraud could be made. . . .
86 Cong.Rec. 2954.

27. See Cramp v. Board of Public Instruction, 368 U.S. 278, 287–288, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939); Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926).
Professor Amsterdam's now-classic commentary on the vagueness doctrine finds the notice element only one of a broad complex of issues involved in the doctrine. Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U.Pa.L.Rev. 67 (1960). However, having dealt with the closely related overbreadth concerns separately, and absent problems of federal-state relations in the judicial review of this federal statute, the problem here is much narrower in scope than is called for in a general analysis of vagueness.

28. See Keyishian v. Board of Regents, supra note 10, 385 U.S. at 597–604, 87 S.Ct. 675, 17 L.Ed.2d 629; Baggett v. Bullitt, 377 U.S. 360, 366–373, 84

S.Ct. 1316, 12 L.Ed.2d 377 (1964); NAACP v. Button, 371 U.S. 415, 432–433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Cramp v. Board of Public Instruction, supra note 23.

29. In looking to such extrinsic aids one is, of course, aware of the potential for aggravation of the vagueness problem by a "prolixity and profusion of statutes, regulations, and administrative machinery, and by manifold cross-references to interrelated enactments and rules." Keyishian, supra note 10, 385 U.S. at 604, 87 S.Ct. at 684. As indicated in the accompanying text, I find the Civil Service Commission's administration of the Hatch Act exceptionally helpful in clarifying the definition of prohibited activity rather than aggravating the problem of its potential for vagueness.

30. 86 Cong.Rec. 2943.

31. Id. at 2938–40. Senator Minton introduced this as pp. 13–80 of a larger document entitled Civil Service Act: Rules, Statutes, Executive Orders and Regulations, Amended to June 30, 1939. Senator Schwellenbach subsequently indicated that he had Form 1236 in his possession as a separate publication, and he referred to portions of the Form in his comments in opposition to Section 15. 86 Cong.Rec. 2949.

tion 15. Indeed, the Supreme Court in *Mitchell* looked to Form 1236 in precisely this manner without expressing any hesitation or doubts about the permissibility of doing so.[32] The Commission similarly used Form 1236 as a guide to the pre-1940 decisions in their early determinations under the Hatch Act.[33]

Today, to further aid government employees in understanding the Act, Form 1236 has been replaced by formal regulations promulgated by the Commission which represent their present interpretation of the meaning and extent of the pre-1940 decisions. 5 C.F.R. Part 733, §§ 733.101–402 (1972).[34] Thus, the requisite notice to federal employees concerning what they must do to avoid taking "an active part in political management or in political campaigns" can be derived both from the rather straightforward statutory language itself, and from the more explicitly descriptive categories of behavior listed in these regulations.[35] To be sure, these do

32. 330 U.S. at 103 & n. 38, 67 S.Ct. 556, 91 L.Ed. 754.

33. Mondello affidavit, *supra* note 12, at 2–3.

34. Part 733 applies only to federal employees. Analogous regulations applicable to covered state and local government employees are contained in Part 151 of Title 5, C.F.R. (1972).

35. The two principal regulations are as follows:

[5 C.F.R.] § 733.111 Permissible activities.

(a) All employees are free to engage in political activity to the widest extent consistent with the restrictions imposed by law and this subpart. Each employee retains the right to—

(1) Register and vote in any election;

(2) Express his opinion as an individual privately and publicly on political subjects and candidates;

(3) Display a political picture, sticker, badge, or button;

(4) Participate in the nonpartisan activities of a civic, community, social, labor, or professional organization, or of a similar organization;

(5) Be a member of a political party or other political organization and participate in its activities to the extent consistent with law;

(6) Attend a political convention, rally, fund-raising function, or other political gathering;

(7) Sign a political petition as an individual;

(8) Make a financial contribution to a political party or organization;

(9) Take an active part, as an independent candidate, or in support of an independent candidate, in a partisan election covered by § 733.124;

(10) Take an active part, as a candidate or in support of a candidate, in a nonpartisan election;

(11) Be politically active in connection with a question which is not specifically identified with a political party, such as a constitutional amendment, referendum, approval of a municipal ordinance or any other question or issue of a similar character;

(12) Service as an election judge or clerk, or in a similar position to perform nonpartisan duties as prescribed by State or local law; and

(13) Otherwise participate fully in public affairs, except as prohibited by law, in a manner which does not materially compromise his efficiency or integrity as an employee or the neutrality, efficiency, or integrity of his agency.

(b) Paragraph (a) of this section does not authorize an employee to engage in political activity in violation of law, while on duty, or while in a uniform that identifies him as an employee. The head of an agency may prohibit or limit the participation of an employee or class of employees of his agency in an activity permitted by paragraph (a) of this section, if participation in the activity would interfere with the efficient performance of official duties, or create a conflict or apparent conflict of interests.

§ 733.122 Political management and political campaigning; prohibitions.

(a) An employee may not take an active part in political management or in a political campaign, except as permitted by this subpart.

(b) Activities prohibited by paragraph (a) of this section include but are not limited to—

(1) Serving as an officer of a political party, a member of a National, State, or local committee of a political party, an officer or member of a committee of a partisan political club, or being a candidate for any of these positions.

not include every conceivable form of political action, with an express finding of "prohibited" or "permissible" applied to each. But such precision is not required; "statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." United States v. National Dairy Products Corporation, 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963). Furthermore, the Commission provides a mechanism for obtaining advisory opinions from the Office of the General Counsel as to the applicability of the Hatch Act to specific situations and circumstances which is widely used by interested employees.[36]

In this context I conclude that the reasonable federal employee is provided an ascertainable standard of conduct that does not impermissibly infringe on his First Amendment freedoms. By the face of the statute he is informed that he may not actively participate in managing, or campaigning for, a partisan political candidate or issue. By the published provisions of the Commission's regulations he is informed of the most commonly recurring factual situations in which the Commission has found the prohibitions of the Act to apply or not to apply. Certainly the standards here are *more precise* than the standards which exist without challenge in other major federal statutes,[37] violations of which

(2) Organizing or reorganizing a political party organization or political club;

(3) Directly or indirectly soliciting, receiving, collecting, handling, disbursing, or accounting for assessments, contributions, or other funds for a partisan political purpose;

(4) Organizing, selling tickets to, promoting, or actively participating in a fund-raising activity of a partisan candidate, political party or political club;

(5) Taking an active part in managing the political campaign of a partisan candidate for public office or political party office;

(6) Becoming a partisan candidate for, or campaigning for, an elective public office;

(7) Soliciting votes in support of or in opposition to a partisan candidate for public office or political party office;

(8) Acting as recorder, watcher, challenger, or similar officer at the polls on behalf of a political party or partisan candidate;

(9) Driving voters to the polls on behalf of a political party or partisan candidate;

(10) Endorsing or opposing a partisan candidate for public office or political party office in a political advertisement, a broadcast, campaign literature, or similar material;

(11) Serving as a delegate, alternate, or proxy to a political party convention;

(12) Addressing a convention, caucus, rally, or similar gathering of a political party in support of or in opposition to a partisan candidate for public office or political party office; and

(13) Initiating or circulating a partisan nominating petition.

Exceptions from the general prohibitions for nonpartisan elections, local elections in areas in which a majority of voters are federal employees, and for certain employees, are spelled out in §§ 733.123–24.

36. Mondello affidavit, *supra* note 12, at 1–2, and attachments. Plaintiffs complain that these advisory opinions are not necessarily binding, if affirmative, nor appealable without risking an enforcement action for having ignored a negative opinion. Another three-judge panel of this court has held, however, that even in the area of alleged First Amendment infringement by the Hatch Act, judicial relief in advance of the full panoply of Civil Service enforcement procedures is not called for. Dingess v. Hampton, 305 F. Supp. 169 (D.D.C.1969) (opinion of McGowan, Circuit Judge). These procedures were intended to provide an expert forum for resolving the frequent doubts involving the "applicability of the variously phrased prohibitions of the Hatch Act to particular conduct," and they provide an opportunity for subsequent judicial review of the constitutional issues presented "on a fully developed record." *Id.* at 174.

37. *Compare, e. g.*, standards for determining liability for various forms of securities fraud, 15 U.S.C. §§ 77q, 77www, 78i, & 78r, anti-trust violations, 15 U.S.C. § 1 et seq., and violations of the Internal Revenue Code, 26 U.S.C. §§ 7201–15. These statutes are not directed specifically at activities protected by the First Amendment, but they can strike more severely in the areas of other constitutional rights.

generally subject the offending party to more severe, criminal, sanctions. In the event that he remains uncertain of the applicability of the Act to the specific course of action he seeks to pursue, he may obtain an advisory opinion from the Office of the General Counsel of the Commission.[38] I believe that no greater certainty than this is required in order to find that 5 U.S.C. § 7324(a) (2) is not impermissibly vague in the constitutional sense—fair notice as to the statute's limitations on employee conduct is amply provided.

## IV

Having found that the definition of prohibited political activity contained in 5 U.S.C. § 7324(a) (2) is not, as construed, overbroad or unconstitutionally vague, I would deny plaintiffs' request for declaratory and injunctive relief against its operation. While I believe that the Commission's interpretation of Section 15 over the years since its enactment has been largely consistent with the construction I have found appropriate here, it is not entirely clear that this has been accomplished explicitly or through the exercise of prosecutorial discretion in the enforcement of the Act.[39] This doubt must be erased, for constitutional protections cannot properly rely on prose-cutorial discretion.[40] I would therefore merely order the Commission to review the pre-1940 decisions in which Congress defined "tak[ing] an active part in political management or in political campaigns," and to change any of its published interpretations and codification material to conform to this opinion and any applicable decisions of the Supreme Court. The Commission's Office of the General Counsel has already endeavored to do this on a continuing basis,[41] and it may well be that their publications and decisions have been kept in line with the Supreme Court's decisions on the First Amendment and other applicable laws. So, in the absence of any specific showing of illegality and in the strong likelihood that no substantial changes will be necessary, I would not retain jurisdiction but would rather merely direct the Commission to review its procedures and published regulations to ensure conformance with this opinion. This would leave any specific regulation subject to individual challenge in the future by individual cases or controversies. I would direct the issuance of an appropriate order to that effect.

To the extent that the majority opinion differs from the foregoing I respectfully dissent. I see no necessity in this stage of our national existence to set aside a

---

38. If, after all of this, he considers that the interpretations provided him violate his First Amendment right to pursue that course of conduct, he is of course free to act. Then, *if* the Commission seeks to enforce the Act against him he will have the full opportunity of administrative and judicial review in which to litigate his First Amendment claims. This opportunity is not dispositive of the issue of the statute's vagueness *vel non*, but it is relevant to the extent that plaintiffs' vagueness claim represents an asserted deprivation of due process. The procedure does provide a forum for resolution of specific, concrete allegations of deprivation of First Amendment rights.

39. *See* Mondello affidavit, *supra* note 12, at 3-4.

40. Baggett, *supra* note 24, 377 U.S. at 373, 84 S.Ct. 1316, 12 L.Ed.2d 377; Cramp, *supra* note 23, 368 U.S. at 286-287, 82 S.Ct. 275, 7 L.Ed.2d 285.

41. *See* Mondello affidavit, *supra* note 12, at 3-4:

The Office of the General Counsel has consistently endeavored to place its operations within the scope of both specific court decisions (*e. g.*, Wilson v. United States Civil Service Commission, 136 F. Supp. 104, D.D.C.1955), and discernible trends in judicial decisions generally. We certainly are aware of the great advances in the areas of individual liberties and due process that have taken place since 1940, and we attempt to administer the Hatch Act in the context of currently accepted constitutional doctrine and other legal doctrines. Should such doctrine collide with a strict interpretation of the Act, the Rule, or past administrative decisions, it is our policy that the current doctrines by which we are bound will prevail.

statute that is as soundly based in our governmental framework as is the Hatch Act. And I am unable to find any authority for this court to overrule, in effect, a decision of the Supreme Court to accomplish that result.