**John E. MOGK and William B. Gould, Plaintiffs,**

v.

**CITY OF DETROIT and George C. Edwards, Defendants.**

**Civ. A. No. 35020.**

United States District Court, E. D. Michigan, S. D.

July 22, 1971.

William B. Gould and John E. Mogk, Detroit, Mich., for plaintiffs.

Michael M. Glusac, Corp. Counsel, Wayne County by Robert D. McClear, Chief Asst. Corp. Counsel, John E. Cross, Asst. Corp. Counsel, Detroit, Mich., for defendants.

Before McCREE, Circuit Judge, THORNTON, Senior District Judge, and ROTH, District Judges.

ROTH, District Judge:

This action was originally instituted as an action for injunctive relief under Title 42 U.S.C. Section 1983 and Title 28 U.S.C. Section 1343(3) and (4). Pursuant to Title 28 U.S.C. Sections 2281 and 2284 a three judge-court was convened.

Plaintiff Mogk attempted to register as a candidate for the City of Detroit Charter Commission but was rejected by the defendant Edwards, City Clerk of the City of Detroit, Michigan, on the ground that he did not meet the residential requirement of the Michigan Home Rule Act, Mich.Comp.Laws, Section 117.18 (M.S.A. Section 5.2097), in that he had not resided in the municipality for three years preceding the then forthcoming election. Upon the hearing for a

preliminary injunction to compel the Clerk to accept Plaintiff's Mogk's registration as a candidate for the charter commission the Court issued the relief prayed for. Plaintiff Gould's complaint was that the action of the City Clerk, in denying Mogk a place on the ballot, by reason of the durational residency requirement of the statute, prevented him from exercising his voting franchise in favor of the candidacy of Mogk. As a consequence of the issuance of the preliminary injunction, Mogk's name appeared on the ballot but he failed to survive the primary election as a nominee and accordingly we are no longer concerned with the prayer for injunctive relief. However, following the primary election the plaintiffs amended their complaint to one seeking relief in declaratory form, pursuant to 28 U.S.C. §§ 2201 and 2202.

The posture of the case as it now stands is that of an action for declaratory relief respecting the constitutionality of Mich.Comp.Laws, Section 117.18. The defendants moved to dismiss on a claim of mootness. Because the "problem is capable of repetition, yet evading review and the need for its resolution thus reflects a continuing controversy in the federal-state area" we denied the claim of mootness. See, Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1, and Brockington v. Rhodes, 396 U.S. 41, 90 S.Ct. 206, 24 L. Ed.2d 209. See also, Blumstein v. Ellington, 337 F.Supp. 323, August 31, 1970, United States District Court for the Middle District of Tennessee.

The defendants take the position that Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497, is controlling in that

"The right to become a candidate for state office, like the right to vote for the election of state officers * * * is a right or privilege of state citizenship, not of national citizenship which alone is protected by the privileges and immunities clause,"

and that, in any event, there is a presumption of constitutionality of state laws, and the durational residency requirement is a proper and rational classification of eligibility for the office in issue. We note that *Snowden* relied on such cases as Pope v. Williams, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817, decided in 1904. The residential requirement here in question originated in the 1909 Home Rule Act of Michigan. We point to these dates to suggest that vast changes have taken place in our way of living between the turn of the century and 1971. What may have been a rational and justifiable classification of eligibility for public office in 1909 may not necessarily be so regarded in the 1970's. In 1909 Marconi's wireless was in its infancy; the vacuum tube and radio had not yet arrived; and, the carriage makers were just turning to making automobiles.

The several constitutions of the state of Michigan have consistently defined a qualified elector of the state as one with United States citizenship and six months residency in the state. Eligibility to the offices of governor and lieutenant governor has required two years of state residency by the Constitutions of 1835, 1850 and 1908, but the 1963 Constitution increased the residency requirement to four years. Art. 5, § 22, Mich.Const. 1963. By Section 26, Article 5, provision is made for succession to the governorship by the lieutenant governor, the secretary of state and the attorney general. Strangely, however, the state residential requirement for the latter two offices is six months. As for federal officers representing a state the United States Constitution requires that a United States Senator shall "when elected be an inhabitant" of the state. Art. 1, § 3, cl. 3. For the office of representative in Congress there is a similar requirement (Art. 1, § 2, U.S.Const.), but none that he be a resident of the district he represents. All other offices filled by election in the state of Michigan require only that the person be a qualified elector, or a United States citizen who has resided in the state for six months. This applies to all public offices from

township offices to state-wide offices, such as justices of the supreme court. Local offices such as township, county or district, require, in addition, thirty days of residency in such unit. See, Mich.Comp.Laws, §§ 168.71, 168.191, 168.391, 168.409, 168.411, 168.431, 168.-467.

Measuring the other durational residency requirements of the state against the one here involved, were we to consider that the test outlined in Drueding v. Devlin, D.C., 234 F.Supp. 721, judgment affirmed, 380 U.S. 125, 85 S.Ct. 807, 13 L.Ed.2d 792, that state durational residency requirements are permissible unless they are "so unreasonable that they amount to an irrational and unreasonable discrimination," remains our guide, we would have to hold that the statutory provision before us does not meet that test. It appears to us, however, that not only the Supreme Court of the United States but the Congress as well has discarded the "reasonableness" test in favor of the "compelling state interest" test. See the Voting Rights Amendment Act of 1970, Pub.L.No.91–285, 84 Stat. 314; Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506; Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600; Kramer v. Union Free School Dist., 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583; Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647; Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24; Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370; and Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523. And when the justification of "compelling state interest" is offered, *Kramer* and *Williams* instruct us that we must meticulously scrutinize the evidence.

■ The Supreme Court has, in election cases, dealt most often with voters' rights rather than the rights of persons to become candidates for public office, but it seems to us that they are, in the main, inextricably intertwined. *Reynolds, supra,* and *Williams, supra,* hold that a citizen has a right to vote effec-

tively and, by logical extension, that means that he is to be given a wide latitude in his choice of public officials. His right to support a candidate of his choice—including himself—cannot be arbitrarily restricted. In addressing himself to the "freeholder" qualification in Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567, Mr. Justice Stewart said:

"We may assume that the appellants have no right to be appointed to the Taliaferro County board of education. But the appellants and the members of their class do have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications." (P. 362, 90 S.Ct. p. 541)

Defendants claim that the three year residency requirement for candidates for the position of member of a charter revision commission is reasonable and understandable; that it takes into consideration that a person who has lived in the community for three years should be better acquainted with the problems of the city and with how they should be corrected. Curiously, a citizen who moves into the community thirty days before the election is presumably qualified to choose those best qualified for membership on the commission. Does this mean that voters can learn in thirty days what a prospective candidate can learn in not less than three years? It seems to us that there is here a strange inconsistency. It occurs to us further that the premise upon which the requirement rests, that is, that citizens who have resided in the municipality for three years next preceding the election are attached to the community and by some process are more aware of its problems and possess better solutions is tenuous at best. Who is to say that a late arrival in the community is not best qualified to fill the office here in question? The problems of one large city are basically no different from the problems of another; most are shared in common by all large cities. The classification here involved was perhaps a ra-

tional one for 1909, when the predominantly rurally-oriented legislature conceived of cities as larger towns—towns in which most of the inhabitants knew each other. We take judicial notice of what any city dweller knows, that tenants in a high-rise dwelling building know very few of their fellow tenants, and that even in single-family dwelling neighborhoods, acquaintanceship rarely encompasses more than persons living within the city block. Taking into account the realities of city life and the problems of the cities we can only conclude that the three year residency requirement has neither logic, reason nor experience to support it. Considering the functions and powers of the other public offices we have mentioned and the impact of the exercise of their powers on the lives of the resident electorate, it appears to us patent that no rational or justifiable excuse can be urged for the disparity in the durational residency requirement between candidates for these offices and the office here in question.

The basic scheme in any election system, including that of Michigan, is designed first, to identify and expose to public scrutiny those who come forward as candidates, and ultimately to select from them those who shall hold public office. Generally the time table of the state election machinery will suffice to accomplish the first objective. It is a matter of common knowledge that those who seek public office go to considerable effort and expense to secure exposure, and it may be safely assumed that opponents in an election race will seek out and make known the shortcomings of their opposition and assert their own superior qualifications for a particular post. If a short sojourn in the community is considered to be a disqualification the electorate may voice its sentiment at the ballot box.

■ We hold that the three year residency requirement for membership on a city revision charter commission, in accordance with the dictates of Mich. Comp.Laws, Section 117.18, is unconsti-

tutional. We hold further that this result obtains whether we view the matter from the standpoint of the voter or the candidate. As Chief Judge Freeman said in Stapleton v. Clerk for City of Inkster, D.C., 311 F.Supp. 1187, 1190:

"* * * It is unquestioned that a voter has a constitutionally protected right to vote for the candidate of his choice and to have his votes counted. Reynolds v. Sims, 377 U.S. 533, 84 S. Ct. 1362, 12 L.Ed.2d 506 (1964). It is also established, as pointed out previously, that a person has a constitutionally protected right to be considered for public office without the burden of invidiously discriminatory disqualifications. Turner v. Fouche, 396 U.S. 346, 362, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). It seems clear to this court that a restriction upon who may be a candidate necessarily affects the efficacy of a person's vote. The effectiveness of the franchise can just as certainly be curtailed by restricting the group from whom candidates may be drawn as by restricting those entitled to cast a vote or by malapportioning a legislative body."