Kenneth R. MANCUSO,
Plaintiff, Appellee,

v.

James L. TAFT, Mayor, et al.,
Defendants, Appellants.

No. 72-1180.

United States Court of Appeals,
First Circuit.

Argued Sept. 13, 1972.

Decided March 20, 1973.

Peter Palombo, Jr., City Sol., with whom Jeremiah S. Jeremiah, Jr., Asst. City Sol., was on brief, for appellants.

Ralph J. Gonnella, Providence, R. I., for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

Kenneth Mancuso, a full time police officer and classified civil service employee of the City of Cranston, Rhode Island, filed as a candidate for nomination as representative to the Rhode Is-

land General Assembly on October 19, 1971. On the same day the Mayor of Cranston began the process of enforcing § 14.09(c) of the City Home Rule Charter which prohibits "continuing in the classified service of the city after becoming a candidate for nomination or election to any public office." Mancuso promptly filed suit in the district court seeking relief pursuant to 42 U.S.C. §§ 1981, 1983, and 1988 and asserting jurisdiction under 28 U.S.C. § 1343 and 28 U.S.C. §§ 2201 and 2202.[1] Pursuant to an agreement of the parties, enforcement of the charter was restrained pending resolution of the issue. The appellant mayor subsequently advised appellee that he would impose only a ten-day suspension and not dismissal if the suit were unsuccessful. The appellee lost the election. The district court granted appellee's motion for summary judgment on the merits, finding § 14.-09(c) violative of the First Amendment, 341 F.Supp. 574 (D.R.I.1972). The city officials appealed. Although we choose to analyze the charter provision in equal protection terms, rather than the First Amendment terms employed by the district court, we affirm its judgment.[2]

1. Mancuso also sought relief against enforcement of § 14.09(f) of the city charter, which prohibits "making directly or indirectly if a member of the classified service any contribution to the campaign funds of any political organization or candidate for public office or taking any part in the management of any political organization or in the conduct of any political campaign further than in the exercise of the rights of a citizen to express his opinion and to cast his vote." This city challenged appellee's standing to attack subsection (f) since it had neither attempted nor threatened to enforce that section against Mancuso. See Wisconsin State Employees Ass'n v. Wisconsin Natural Resources Bd., 298 F. Supp. 339, 344–345 (W.D.Wis.1969) [hereinafter Wisconsin State Employees]. Mancuso argued that since he had violated the terms of that subsection and since the city had already "noticed" his conduct by attempting to enforce a related provision against him, he should be able to attack subsection (f). The district court ruled Mancuso had standing and proceeded to find subsection (f) unconstitutional. Whether or not the actions of the parties have so crystallized as to present a justiciable controversy as to subsection (f) is a very close question. Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) ; Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) ; Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964).

However, another factor has made it unnecessary for us to decide that difficult issue. At oral argument the city represented to this court that subsection (f) is designed to cover the activities of employees who participate in the campaigns of other people and that only subsection (c) is intended to cover the activities of the candidate employee. While not as authoritative as an official construction of the statute, this clarification has persuaded us that Mancuso should not have been allowed to attack subsection (f). The city's interpretation is reasonable. It makes sense out of both subsections and renders neither surplusage. The interpretation is bolstered by the existence of another subsection, (e), proscribing the solicitation of funds, which stands in the same posture as (f), i. e., a more specific functional prohibition, which is necessarily embraced, insofar as candidates are concerned, by the flat ban of (c). It seems entirely reasonable to conclude that these narrower controls are not designed for the major offender. In addition, the city's action in this case, threatening enforcement only of (c), is consistent with this interpretation. These factors, taken together, render Mancuso's challenge to subsection (f) too speculative for federal judicial resolution at this time.

Appellee also challenged, and the district court invalidated, the city's Civil Service Rule X, parts 3(c) and (f) which implement the charter provision. For the reasons just noted, we do not adjudicate the validity of part 3(f). We see no barrier, however, to our consideration of the challenge to both subsection (c) of the charter and part 3(c) of the Rules, although for convenience we refer hereafter only to the charter provision. Since the appellee clearly has a cause of action under 42 U.S.C. § 1983, we need not consider whether he also could have proceeded under the other provisions he invoked.

2. The appellee below attacked the Cranston charter provision on both First Amendment and equal protection grounds. We recognize that some basic issues must be faced under either analysis but choose

### Standing

■ At the outset, we acknowledge that our first impression was that while assault on the charter might be made by other city employees seeking office, appellee was in a poor position to complain. He is a policeman, an official called upon for important exercise of discretion, and he ran as a candidate for a partisan nomination for the position of state representative for the very district in which he served as policeman. But several independent reasons, which we deem persuasive, singly and collectively, have led us to the conclusion that appellee's right to raise this equal protection challenge does not depend on the possibility of his conduct being properly proscribed by a more narrowly drawn provision.

First, we are of the opinion, for reasons stated subsequently, that the charter provision significantly affects the exercise of First Amendment rights by Cranston's public employees. In such circumstances, binding precedent—Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); Dombrowski v. Pfister, 380 U.S. 479, 85 S. Ct. 1116, 14 L.Ed.2d 22 (1965); United States v. Raines, 362 U.S. 17, 22, 80 S. Ct. 519, 4 L.Ed.2d 524 (1960); Goguen v. Smith, 471 F.2d 88 (1st Cir. Dec. 14, 1972); see also Muller v. Conlisk, 429 F.2d 901 (7th Cir. 1970)—as well as the sound underlying policy of avoiding the chilling impact of piecemeal adjudication of fundamental rights require consideration of a facial attack by one affected by the regulation. We see no reason why this standing rule should change when

First Amendment rights are analyzed in an equal protection context. Grayned v. City of Rockford, 408 U.S. 104, 106–107, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).[3]

■ Second, we believe that both candidates and voters may challenge on its face on equal protection grounds a candidacy restriction because of its impact on voting rights. A candidate for public office, such as the appellee, is so closely related to and dependent upon those who wish to vote for him and his litigation will so vitally affect their rights that courts will relax the rule of practice (which is designed to assure vibrant representation of the vital interests of non-parties) and will permit a candidate to raise the constitutional rights of voters. Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); Green v. McKeon, 335 F.Supp. 630 (E.D.Mich.1971), aff'd, 468 F.2d 883 (6th Cir. 1972); see generally Eisenstadt v. Baird, 405 U.S. 438, 444–446, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Moreover, we note that under § 17–14–2, General Laws of Rhode Island, a candidate must himself be a qualified voter in the district which he seeks to represent. Hence, in one sense, appellee seeks only to assert the rights of his own class. That voters and candidates may attack candidacy restrictions affecting voting rights on their face seems indisputable. Bullock, supra; Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); Green, supra; Manson v. Edwards, 345

to review the provision under the equal protection clause. We do this because § 14.09(c) of the charter treats the right to run for public office, a right implicating not only First Amendment principles but also the principles established in the cases dealing with the public's right to an unfettered and meaningful vote, cases usually framed in an equal protection context. See Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). As

our discussion of the First Amendment interests indicates, we would reach the same result were we to use direct First Amendment analysis.

3. We do not read Judge Campbell's dissent as denying the existence of a First Amendment right here, or the charter provision's serious impact on the exercise of that right, and thus appellee's standing to mount a facial attack. Rather his balancing of the interests of municipality and citizen indicates to us an adjudication of the merits.

F.Supp. 719 (E.D.Mich.1972); McKinney v. Kaminsky, 340 F.Supp. 289 (M.D.Ala.1972); Mogk v. City of Detroit, 335 F.Supp. 698 (E.D.Mich.1971) (three-judge court). In this regard, the dissent's disagreement seems to be only with the standard, not the propriety, of review.

■■ Finally, we believe that in any case, whether or not the regulation implicates First Amendment or voting rights, one within the terms of a classification may challenge it facially on equal protection grounds. Although the language of the *Raines* rule, 362 U.S. at 21, 80 S.Ct. 519, would seem to cover equal protection claims, we find that both precedent and sound policy reject its application. We know of no case in which the Supreme Court has refused to consider a facial equal protection challenge by one within the affected classification.[4] Nor has the Supreme Court explicitly considered whether the claimant could properly be subject to a narrower regulation. Rather, in all cases, the Court has simply analyzed the challenged classification on its face.[5] We believe the Court has eschewed "hard core" analysis in this area because of its invitation to judicial legislation. Facial consideration forces a court to

4. In Wade v. Wilson, 396 U.S. 282, 90 S.Ct. 501, 24 L.Ed.2d 470 (1970), the Court refused to consider an equal protection challenge to a court rule furnishing co-defendants only one transcript to be shared on appeal. Although the Court cited *Raines*, its reasoning was that claimant, who had been loaned a separate copy by the State Attorney General, could not attack the classification which had not adversely affected him. *Id.* at 286, 90 S.Ct. 501.

Collins v. Texas, 223 U.S. 288, 32 S.Ct. 286, 56 L.Ed. 439 (1912), from which the dissent quotes language suggestive of a hard-core exception, seems to us to represent only the *Wade* principle. There an osteopath challenged on due process and equal protection grounds a Texas statute making criminal the practicing of medicine for money without having registered with the appropriate Board. The Court held that his challenge to the statutory definition of medicine need not be considered since he had never tried to get a license which the Court assumed would have been granted had he submitted his professional diploma. The case thus seems to stand for the proposition that one arguably eligible for statutory benefits may not challenge the statute as unconstitutional until he has sought and been denied the benefits, i. e., is within the deprived class. *See* Morf v. Bingaman, 298 U.S. 407, 413, 56 S.Ct. 756, 80 L.Ed. 1245 (1936); Hendrick v. Maryland, 235 U.S. 610, 621, 35 S.Ct. 140, 59 L.Ed. 385 (1915); Standard Stock Food Co. v. Wright, 225 U.S. 540, 550, 32 S.Ct. 784, 56 L.Ed. 1197 (1912).

5. *See, e. g.*, Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); Railway Express Agency v. New York, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949); Williamson v. Lee Optical Co., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957); McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966); Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); James v. Strange, 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972); Eisenstadt v. Baird, *supra.* Even the Chief Justice's lone dissent in *Baird* was only on the grounds that the respondent there was not within the affected class, i. e., authorized distributors, *see* n. 4 *supra*, not on the grounds that one within the class but possibly subject to less broad rules cannot complain.

We note that the Court has recently permitted and upheld a facial attack on the Texas abortion statute based on due process grounds despite a dissenting member's objection that the plaintiff may not have had standing to challenge the statute on its face since she may have been, as of the time of the filing of the complaint, within her third trimester as to which the Court permitted regulation even to the point of prohibition. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (U.S. Jan. 22, 1973). Since the Court there used the same analysis we employ here, i. e., whether the regulation which affects a fundamental interest is narrowly drawn to promote a compelling state interest, we deem the facial consideration in *Doe* supportive of our reading of past equal protection cases.

analyze and approve (or disapprove) only one regulation—that written by the legislative body. To close the courthouse door on hard core plaintiffs requires a precise determination (and necessarily approval) of the permissible outer limits of narrower legislation. The number of such determinations would be limited only by the number of differently situated plaintiffs. In contrast, facial adjudication requires only consideration of the various factors which suggest the possibility of less drastic alternatives, without forcing specific definition of the permissible limits. Moreover, unlike disorderly conduct, breach of peace, or other roughly defined proscriptions, statutory classifications subjected to equal protection challenge usually leave no question as to the persons subject to the regulation. Individual adjudications would therefore appear unnecessarily to impose repetitive judicial scrutiny and possibly interven-tion. Ironically, then, in equal protection litigation of broad, unambiguous classifications, judicial restraint would seem to us to require facial rather than individual adjudication.[6] We therefore hold that the appellee has standing.

## Standard of Scrutiny

Appellee's complaint, simply put, is that Cranston has divided its citizenry into two groups for purposes of candidacy for public office: in one group, all classified civil servants, who are prohibited from filing as candidates; and, in the other, all other citizens, free to run for office, subject only to general age and similar requirements. In determining the propriety of this discrimination, we must first examine the nature of the interests infringed by § 14.09(c) to ascertain the proper standard of review.

■ The Supreme Court has tended to use one of two standards for review

6. Judge Campbell's suggestion of a standing rule in equal protection cases dependent upon the nature of the attack—i. e., allowing a hard core plaintiff to challenge if his attack is based on underinclusiveness but denying standing generally if his claim is that the prohibition is overinclusive—seems to us, wholly apart from the prudential reasons noted above and the difficulty of apply his formula for overinclusiveness challenges, to be without authority and an unnecessary straitjacketing of the court and the parties. As to the authorities, *Grayned, supra,* involved an overinclusiveness claim—that the picketing ordinance banned peaceful as well as non-peaceful, non-labor picketing—raised by an admitted hard core offender. 408 U.S. at 106, 92 S.Ct. 2294. *Skinner* was admittedly *decided* on underinclusiveness grounds, but came to the Court—and won the concurrence of the Chief Justice—primarily on overinclusiveness claims (not all three-time thieves are parents of potentially dangerous offspring), though phrased in due process terms. *Baird* was explicitly decided on both over- and underinclusiveness, 405 U.S. at 450–454, 92 S.Ct. 1029. *See also* United States v. Bishop, 469 F.2d 1337 (1st Cir. 1972).

*Skinner* and *Baird,* moreover, reveal the problems of practicality of the proposal. Many cases involve both under- and overinclusiveness claims. Concern for mere judicial efficiency, not to mention fairness to the parties (including the affected government) would dictate adjudication of all of an individual's claims at once. This case is an example. Although we find overinclusiveness problems regarding the integrity rationale—the ban covering many whose candidacy would pose no danger to the system's honesty—we see the charter provision as underinclusive in relation to the efficiency rationale—not covering many other outside activities which could also drain employee energy and distract co-workers. Were the appellee to be limited to an underinclusive complaint, the municipality would be deprived of its strongest defense, its compelling interest in the integrity of its civil service. Moreover, had appellee known that he was to be so limited, he might have been able to show that others working for the city, but designated by Civil Service Rule XV as being in the unclassified service—such as independent real estate appraisers, engineers, management consultants, and even political appointees—exercised discretionary functions and possessed confidential information, and hence presented risks of abuse of power similar to those posed by the employees subject to the ban. We do not see the gain in so circumscribing a plaintiff, a defendant, or, for that matter, a court.

when determining whether a particular state action violates the equal protection clause of the Fourteenth Amendment. For state action concerning economic regulation and taxation, the Court has employed a relaxed review, upholding the challenged action if it is sustained by some rational and legitimate state interest. *See* Kotch v. Bd. of River Port Pilot Comm'rs, 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093 (1947). For state action which substantially infringes fundamental interests, however, the Court has subjected the state action to stricter scrutiny, requiring the state to show that its action is necessary to promote a compelling state interest.[7]

■ In evaluating candidacy restrictions there are two interlocking interests, both fundamental, that must be considered. We naturally consider the rights asserted by the plaintiff in claiming the opportunity to become a candidate for public office. But whenever a state or city regulates the right to become a candidate for public office, it also regulates the citizen's right to vote; the person or persons whose candidacy is affected may be the voters' choice for public official. As Chief Justice Burger stated in the recent case of Bullock v. Carter, 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972), "[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." Therefore, in order to properly consider the impact of

the Cranston charter provision and hence to arrive at a standard of review, we consider also the public interest in an unhampered, unconditioned vote, as reflected here by the voters' interest in having a broad pool of candidates from which to select their public officials. Because guidance from the Supreme Court on this matter is more recent and direct, we turn to this latter dimension of the candidacy problem first.

## A. Voting Rights

■ In *Bullock,* the Chief Justice stated that not every candidate restriction affects the right to vote sufficiently to require a strict equal protection review of the restriction. The task of the federal courts is to "examine in a realistic light the extent and nature of their impact on voters." 405 U.S. at 143, 92 S.Ct. at 856. The *Bullock* Court cited two factors which persuaded it to use strict review on a law which required potential candidates to pay filing fees totalling upwards of $1000 before they would be placed on the primary ballot: the pool of candidates available for selection by the voters was substantially diminished and the impact of the restriction fell on citizens according to their economic status. Although we face a somewhat different situation from that in *Bullock,* we find similar factors here indicating a substantial and significant effect on voters' rights.

We note initially that while in *Bullock* the filing fees were so large that they indirectly limited the pool of candidates,

7. It is not entirely clear whether the allegation of any infringement of a fundamental interest triggers strict review or whether the infringement must be substantial before the statute requires more than a "reasonableness" review. *Compare* Bullock v. Carter, 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972) ["Of course, not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review", citing McDonald v. Board of Election, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969)] with Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964) ["Especially

since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."] Since a substantiality requirement might be read into the word infringement, the matter may be of no moment. Nevertheless, we need not decide this issue because we find that, after considering the matter before us, there is here a substantial burden on both voting and First Amendment rights sufficient to invoke the rigor of strict equal protection review.

here the pool is directly and substantially limited by a prohibition on the candidacies of a specific class of people—the public employees of Cranston. As the district court noted, 341 F.Supp. at 576–577, and as other courts have recognized, *see, e. g.*, Bagley v. Washington Township Hospital District, 65 Cal.2d 499, 55 Cal.Rptr. 401, 421 P.2d 409 (1966), the number of citizens who find employment in the public sector has grown tremendously over the years.[8] To prohibit these citizens from seeking public office constitutes a substantial contraction of the potential candidacy pool.[9] Moreover, this significant number of people who are covered by the Cranston rule are deterred from seeking office in a very effective manner. Cranston does not have a system which makes it easy for the public employee to accommodate his interest in his job and his interest in seeking elective office. Rather, § 14.-09(c), by requiring resignation "after becoming a candidate for nomination or election" necessitates an extremely difficult decision by the potential candidate: he must either give up his public job or he must give up his candidacy.

Secondly, the Cranston charter excludes a specific group with unique qualifications for public office. City employees have made government their daily work. They see the work of government within their department and as their department deals with the public and other parts of government, local, county, state, and national. They ought to be able to pinpoint problems and formulate solutions much more effectively than many other citizens. The experience and insight garnered from day-to-day grappling with the bureaucracy could well make these individuals particularly attractive to the voters. For these reasons, then, we find that the fundamental interest of the right to vote is significantly affected by § 14.09(c) of the Cranston charter and that therefore strict equal protection review must be applied.[10]

---

**8.** According to latest census figures, there are approximately 2,700,000 federal employees and 9,900,000 employees of state and local government, excluding personnel of the armed forces. U.S. Bureau of the Census, Statistical Abstract of the United States 221 (1971).

**9.** We do not know if the number of potential candidates excluded by the Cranston charter provision would be as large as the number excluded by the filing fees required by a statute like that considered in *Bullock*. The Court there found that the fees were so large that many candidates would be effectively precluded from access to the ballot. 405 U.S. at 143, 92 S.Ct. 849. On the other hand, the Chief Justice noted that undoubtedly some candidates of modest means could secure ballot positions by soliciting contributions from friends and supporters. In contrast, because of the flat exclusion of civil servants this charter may effectuate a greater proportional contraction of the candidacy pool. Regardless of how one compares the scope of the exclusion here with that in *Bullock*, however, we conclude that the exclusion in the present case is a substantial one.

**10.** The dissent, although not denying that the candidacy ban here effects a substantial contraction of the potential candidacy pool and thus of voter choice, focuses upon the lack of an "invidious economic" burden, such as that in *Bullock*, in finding strict scrutiny inapplicable. Although the Court in *Bullock* considered the economic impact as one of the two factors triggering strict scrutiny in that case, it did not say, and we do not believe that it could have meant, that only economic restrictions with a substantial effect upon voter choice demand rigorous review. In Williams v̇. Rhodes, *supra*, the Supreme Court found that state statutes restricting minority party access to the ballot heavily burdened the right to vote and thus required strict equal protection review. We note that other courts have held that durational residency, Mogk v. City of Detroit, 335 F.Supp. 698 (E.D. Mich.1971) (three-judge court); McKinney v. Kaminsky, 340 F.Supp. 289 (M.D. Ala.1972); Gangemi v. Rosengard, 44 N.J. 166, 207 A.2d 665 (1965), and age restrictions, Manson v. Edwards, 345 F. Supp. 719 (E.D.Mich.1972), on candidacy require strict scrutiny even without consideration of whether another fundamental interest, such as the right to travel, was involved.

## B. First Amendment Rights

■ We now inquire whether the interest of the individual in running for public office is an interest protected by the First Amendment, so that any law which significantly infringes that interest must be given strict review.[11] The Supreme Court has never directly decided this point. However, Williams v. Rhodes, *supra*, strongly suggests that the activity of seeking public office is among those protected by the First Amendment. Moreover, two state supreme courts have found, in facially invalidating flat bans on public employee candidacies challenged by deputy sheriffs, that the right to run for office is a First Amendment right. Minielly v. State, 242 Or. 490, 411 P.2d 69 (1966) (*en banc*); Kinnear v. City and County of San Francisco, 61 Cal.2d 341, 38 Cal. Rptr. 631, 392 P.2d 391 (1964) (*en banc*). *See also* Fort v. Civil Service Comm'n, 61 Cal.2d 331, 38 Cal.Rptr. 625, 392 P.2d 385 (1964) (*en banc*); DeStefano v. Wilson, 96 N.J.Super. 592, 233 A.2d 682 (1967). We come to the same conclusion.

■ The right to run for public office touches on two fundamental freedoms: freedom of individual expression and freedom of association. Freedom of expression guarantees to the individual the opportunity to write a letter to the local newspaper, speak out in a public park, distribute handbills advocating radical reform, or picket an official building to seek redress of grievances.

All of these activities are protected by the First Amendment if done in a manner consistent with a narrowly defined concept of public order and safety. *See* Cox v. Louisiana, 379 U.S. 536, 554–555, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). The choice of means will likely depend on the amount of time and energy the individual wishes to expend and on his perception as to the most effective method of projecting his message to the public. But interest and commitment are evolving phenomena. What is an effective means for protest at one point in time may not seem so effective at a later date. The dilettante who participates in a picket line may decide to devote additional time and resources to his expressive activity. As his commitment increases, the means of effective expression changes, but the expressive quality remains constant. He may decide to lead the picket line, or to publish the newspaper. At one point in time he may decide that the most effective way to give expression to his views and to get the attention of an appropriate audience is to become a candidate for public office—means generally considered among the most appropriate for those desiring to effect change in our governmental systems. He may seek to become a candidate by filing in a general election as an independent[12] or by seeking the nomination of a political party. And in the latter instance, the individual's expressive activity has two dimensions: besides urging that his views be the views of the elected public official,

11. In Williams v. Rhodes, *supra*, the Court held that First Amendment rights were "fundamental" for purposes of equal protection review. *See also* Police Department of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

 As noted above, the Supreme Court in *Bullock* stated that only candidate restrictions with substantial impact on voters would receive the strict review appropriate for legislation which affects the right to vote. We need not decide whether a similar threshold determination is required with regard to an individual's right to run for office, since we find that the provision here at issue imposes a severe hurdle to appellee's candidacy and hence to his exercise of his First Amendment rights. As noted above, it does not merely present the would-be candidate with minor requirements before being entitled to a place on the ballot; it forces the public employee to make an all-or-nothing choice between his job and his candidacy.

12. While independent candidates may often be unsuccessful in partisan elections, we take judicial notice of the fact that local elections are often nonpartisan in nature, and that even in partisan contests, independent candidates do occasionally win.

he is also attempting to become a spokesman for a political party whose substantive program extends beyond the particular office in question. But Cranston has said that a certain type of its citizenry, the public employee, may not become a candidate and may not engage in any campaign activity that promotes himself as a candidate for public office. Thus the city has stifled what may be the most important expression an individual can summon, namely that which he would be willing to effectuate, by means of concrete public action, were he to be selected by the voters.

 It is impossible to ignore the additional fact that the right to run for office also affects the freedom to associate. In Williams v. Rhodes, *supra,* the Court used strict review to invalidate an Ohio election system that made it virtually impossible for third parties to secure a place on the ballot. The Court found that the First Amendment protected the freedom to associate by forming and promoting a political party and that that freedom was infringed when the state effectively denied a party access to its electoral machinery. The Cranston charter provision before us also affects associational rights, albeit in a slightly different way. An individual may decide to join or participate in an organization or political party that shares his beliefs. He may even form a new group to forward his ideas. And at some juncture his supporters and fellow party members may decide that he is the ideal person to carry the group's standard into the electoral fray. To thus restrict the options available to political organization as the Cranston charter provision has done is to limit the effectiveness of association; and the freedom to associate is intimately related with the concept of making expression effective. *See* Williams v. Rhodes, 393 U.S. 23 at 41–42, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (Harlan, J., concurring); *cf.* NAACP v. Button, 371 U.S. 415, 429–431, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Party access to the ballot becomes less meaningful if some of those selected by party machinery to carry the party's programs to the people are precluded from doing so because those nominees are civil servants.

 Whether the right to run for office is looked at from the point of view of individual expression or associational effectiveness, wide opportunities exist for the individual who seeks public office. The fact of candidacy alone may open previously closed doors of the media. The candidate may be invited to discuss his views on radio talk shows; he may be able to secure equal time on television to elaborate his campaign program; the newspapers may cover his candidacy; he may be invited to debate before various groups that had theretofore never heard of him or his views. In short, the fact of candidacy opens up a variety of communicative possibilities that are not available to even the most diligent of picketers or the most loyal of party followers. A view today, that running for public office is not an interest protected by the First Amendment, seems to us an outlook stemming from an earlier era when public office was the preserve of the professional and the wealthy.[13] Consequently we hold that candidacy is both a protected First Amendment right and a fundamental interest. Hence any legislative classification that significantly burdens that interest must be subjected to strict equal protection review.[14]

13. Thus we cannot concur with the court in Johnson v. State Civil Service Dept., 280 Minn. 61, 157 N.W.2d 747 (1968), when it states that public office is usually sought "for the purpose of earning a living or advancing one's political career."

14. The appellant refers to Snowden v. Hughes, 321 U.S. 1, 7, 64 S.Ct. 397, 400,

88 L.Ed. 497 (1944), for the proposition that "[t]he right to become a candidate for state office, like the right to vote for the election of state officers . . . is a right or privilege of state citizenship, not of national citizenship." In *Snowden,* the plaintiff sought relief under the Fourteenth Amendment and the Civil Rights

Our conclusion that § 14.09(c) of the Cranston charter must receive strict equal protection scrutiny is made with full cognizance of the city's assertion that United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), in which the Supreme Court upheld a provision of the federal Hatch Act, requires a more relaxed "reasonableness" standard of review. We deem *Mitchell* not controlling on this question for several reasons. First, and most important, is the fact that the *Mitchell* Court was not faced with, and did not rule on, an equal protection challenge. Indeed, until the Supreme Court's decision in Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), it was not clear that the equal protection clause was fully applicable, through the Fifth Amendment's due process clause, to legislation such as the provision of the Hatch Act which was considered in *Mitchell*. Moreover, although the Court, in response to the petitioner's First, Fifth, Ninth, and Tenth Amendment claims considered rights of expression and political activity, there was no discussion of the impact of the restrictions on voting rights.

■ Second, we note that even in the First Amendment area, the *Mitchell* case may have been drained of its vitality by the development of constitutional doctrine in the past twenty-five years. As the district court pertinently observed, 341 F.Supp. at 577–581, the expanded use of the overbreadth doctrine in evaluating statutes which touch areas protected by the First Amendment casts serious doubt on the validity of employing a "reasonableness" standard for review of provisions regulating the expressive activity of public employees. *See* Hobbs v. Thompson, 448 F.2d 456, 471–475 (5th Cir. 1971); Fort v. Civil Service Comm'n, supra; National Ass'n of Letter Carriers v. United States Civil Service Comm'n, 346 F.Supp. 578 (D.D. C.1972), prob. juris. noted, 409 U.S. 1058, 93 S.Ct. 560, 34 L.Ed.2d 510 (Dec. 11, 1972). *But see* Broadrick v. Oklahoma, 338 F.Supp. 711, 716 (W.D.Okl.1972), prob. juris. noted, 409 U.S. 1058, 93 S.Ct. 550, 34 L.Ed.2d 510 (Dec. 11, 1972). To the extent, moreover, that the *Mitchell* Court relied on the notion that public employment is a privilege rather than a right, and that the constitutional validity of legislative regulation turns on proper pigeon-holing of the rights and the privileges, 330 U.S. at 99 n. 34, 67 S.Ct. 556, its precedential value is even more questionable. Since *Mitchell*, the Court, in an unbroken line of decisions, has abolished the right-privilege distinction. *See* Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460

Act, claiming that election officials had improperly certified the results of a primary election in which he had been a candidate. The part of the opinion quoted dealt with the interpretation of the first clause of the Fourteenth Amendment and ruled that the right to become a candidate for state office was not a privilege or immunity under the national Constitution. Proceeding to subsequent clauses of the Amendment, the Court found that an equal protection claim could not be grounded in the statutory classification made by the legislature, for the legislation on its face was harmless; rather it held that any denial of equal protection in the case before it had to be proved by showing arbitrary application of the statute by the election board. Thus the Court did not reach the question of whether the First Amendment, through the Fourteenth Amendment, protected the right to run for

office against unjustified legislative classifications. A second reason why *Snowden* is not controlling is that it is a product of an outlived theory of the division of federal and state responsibilities. The very quote which speaks of the right to run for state office also speaks of the right to vote in state elections, and cites Breedlove v. Suttles, 302 U.S. 277, 283, 58 S.Ct. 205, 82 L.Ed. 252 (1937) as support. But in 1966 the Supreme Court, in Harper v. Virginia Bd. of Elections, 383 U.S. 663, 669, 86 S.Ct. 1079, 16 L. Ed.2d 169 overruled *Breedlove*, holding that the Constitution protected the right to vote in state elections from the state's imposition of a poll tax. Finally, the charter provision in question in this case is not limited to the right to run for state office but also prohibits candidacies for national offices.

(1958); Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L. Ed.2d 811 (1968); Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L. Ed.2d 534 (1971). *See generally* Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv.L.Rev. 1439 (1968). In addition, we note factual distinctions between *Mitchell* and the present case which we deem of legal significance. *Mitchell* treated the United States Hatch Act where appellee challenges the charter provision of the city of Cranston and hence strict *stare decisis* is not involved, *cf.* Flood v. Kuhn, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972); the Hatch Act provision prohibited only partisan political activity while the Cranston charter covers both partisan and nonpartisan activity; and the provision at bar specifically limits the right to become a candidate for public office while in *Mitchell* the Court was faced only with restrictions on the arguably less significant right of routine political participation. Finally, we note that the constitutionality of the Hatch Act and an analogous state statute is presently before the Court. *National Ass'n of Letter Carriers* and *Broadrick, supra.*

### Interest of the Community

■ In proceeding to the second stage of active equal protection review, however, we do see some contemporary relevance of the *Mitchell* decision. *National Ass'n of Letter Carriers, supra.* In order for the Cranston charter provision to withstand strict scrutiny, the city must show that the exclusion of all government employees from candidacy is necessary to achieve a compelling state interest. Kramer v. Union Free School District, 395 U.S. 621, 627, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). And, as stated in *Mitchell* and other cases dealing with similar statutes, *see Wisconsin State Employees, supra; Broadrick, supra,* government at all levels has a substantial interest in protecting the integrity of its civil service. It is obviously conceivable that the impartial character of the civil service would be seriously jeopardized if people in positions of authority used their discretion to forward their electoral ambitions rather than the public welfare. Similarly if a public employee pressured other fellow employees to engage in corrupt practices in return for promises of post-election reward, or if an employee invoked the power of the office he was seeking to extract special favors from his superiors, the civil service would be done irreparable injury. Conversely, members of the public, fellow-employees, or supervisors might themselves request favors from the candidate or might improperly adjust their own official behavior towards him. Even if none of these abuses actually materialize, the possibility of their occurrence might seriously erode the public's confidence in its public employees. For the reputation of impartiality is probably as crucial as the impartiality itself; the knowledge that a clerk in the assessor's office who is running for the local zoning board has access to confidential files which could provide "pressure" points for furthering his campaign is destructive regardless of whether the clerk actually takes advantage of his opportunities. For all of these reasons we find that the state indeed has a compelling interest in maintaining the honesty and impartiality of its public work force.

■ We do not, however, consider the exclusionary measure taken by Cranston—a flat prohibition on office-seeking of all kinds by all kinds of public employees—as even reasonably necessary to satisfaction of this state interest. Bullock v. Carter, 405 U.S. at 144, 92 S.Ct. 849. As Justice Marshall pointed out in Dunn v. Blumstein, 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972) "[s]tatutes affecting constitutional rights must be drawn with 'precision'. NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); United States v. Robel, 389 U.S. 253, 265, 88 S.Ct. 419, 19 L.Ed. 2d 508 (1967)". For three sets of reasons we conclude that the Cranston

charter provision pursues its objective in a far too heavy-handed manner and hence must fall under the equal protection clause. First, we think the nature of the regulation—a broad prophylactic rule—may be unnecessary to fulfillment of the city's objective. Second, even granting some sort of prophylactic rule may be required, the provision here prohibits candidacies for all types of public office, including many which would pose none of the problems at which the law is aimed. Third, the provision excludes the candidacies of all types of public employees, without any attempt to limit exclusion to those employees whose positions make them vulnerable to corruption and conflicts of interest.

As to approaches less restrictive than a prophylactic rule, there exists the device of the leave of absence.[15] Some system of leaves of absence would permit the public employee to take time off to pursue his candidacy while assuring him his old job should his candidacy be unsuccessful. Moreover, a leave of absence policy would eliminate many of the opportunities for engaging in the questionable practices that the statute is designed to prevent. While campaigning, the candidate would feel no conflict between his desire for election and his publicly entrusted discretion, nor any conflict between his efforts to persuade the public and his access to confidential documents. But instead of adopting a reasonable leave of absence policy, Cranston has chosen a provision that makes the public employee cast off the security of hard-won public employment should he desire to compete for elected office.

The city might also promote its interest in the integrity of the civil service by enforcing, through dismissal, discipline, or criminal prosecution, rules or statutes that treat conflict of interests, bribery, or other forms of official corruption. By thus attacking the problem directly, instead of using a broad prophylactic rule, the city could pursue its objective without unduly burdening the First Amendment rights of its employees and the voting rights of its citizens. Last term in Dunn v. Blumstein, the Supreme Court faced an analogous question when the State of Tennessee asserted that the interest of "ballot box purity" justified its imposition of one year and three month residency requirements before a citizen could vote. Justice Marshall stated, *inter alia,* that Tennessee had available a number of criminal statutes that could be used to punish voter fraud without unnecessary infringement on the newcomer's right to vote. *Id.* at 353–354, 92 S.Ct. 995.[16] Similarly, it appears from the record in this case that the Cranston charter contains some provisions that might be used against opportunistic public employees.[17]

Even if some sort of prophylactic rule is necessary, we cannot say that Cranston has put much effort into tailoring a narrow provision that attempts to match the prohibition with the problem. The charter forbids a Cranston public employee from running for any office, anywhere. The prohibition is not limited to

---

15. *See* Gray v. City of Toledo, 323 F.Supp. 1281 (N.D.Ohio 1971) ; Wisconsin State Employees, *supra.*

16. *Cf.* Schneider v. State, 308 U.S. 147, 164, 60 S.Ct. 146, 84 L.Ed. 155 (1939) (fear of fraudulent solicitations cannot justify permit system since "frauds may be denounced as offenses and punished by law.")

17. The following practices are prohibited by section 14.09 of the city charter:
"(b) wilfully or corruptly making any false statement, certificate, mark, grade,

rating or report to any examination or test held or certification or appointment made under the provisions of this chapter or in any manner committing or attempting to commit any fraud preventing the impartial execution of such provisions or the rules and regulations established thereunder.
\* \* \* \* \*
(d) giving, rendering or paying any money, service or other valuable thing for, or account of or in connection with an appointment, promotion or proposed appointment or promotion."

the local offices of Cranston, but rather extends to statewide offices and even to national offices.[18] It is difficult for us to see that a public employee running for the United States Congress poses quite the same threat to the civil service as would the same employee if he were running for a local office where the contacts and information provided by his job related directly to the position he was seeking, and hence where the potential for various abuses was greater. Nor does the Cranston charter except the public employee who works in Cranston but aspires to office in another local jurisdiction, most probably his town of residence. Here again the charter precludes candidacies which can pose only a remote threat to the civil service. Finally, the charter does not limit its prohibition to partisan office-seeking, but sterilizes also those public employees who would seek nonpartisan elective office. The statute reviewed in *Mitchell* was limited to partisan political activity, and since that time other courts have found the partisan-nonpartisan distinction a material one. *See Kinnear, supra; Wisconsin State Employees, supra;* Gray v. Toledo, supra. While the line between nonpartisan and partisan can often be blurred by systems whose true characters are disguised by the names given them by their architects, it seems clear that the concerns of a truly partisan office and the temptations it fosters are sufficiently different from those involved in an office removed from regular party politics to warrant distinctive treatment in a charter of this sort.

The third and last area of excessive and overinclusive coverage of the Cranston charter relates not to the type of office sought, but to the type of employee seeking the office. As Justice Douglas pointed out in his dissent in *Mitchell*, 330 U.S. at 120–126, 67 S.Ct.

556, restrictions on administrative employees who either participate in decision-making or at least have some access to information concerning policy matters are much more justifiable than restrictions on industrial employees, who, but for the fact that the government owns the plant they work in, are, for purposes of access to official information, identically situated to all other industrial workers. Thus, a worker in the Philadelphia mint could be distinguished from a secretary in an office of the Department of Agriculture; so also could a janitor in the public schools of Cranston be distinguished from an assistant comptroller of the same city. A second line of distinction that focuses on the type of employee is illustrated by the cases of *Kinnear* and *Minielly, supra.* In both of these cases a civil service deputy decided to run for the elected office of sheriff. The courts in both cases felt that the no-candidacy laws in question were much too broad and indicated that perhaps the only situation sensitive enough to justify a flat rule was one in which an inferior in a public office electorally challenged his immediate superior. Given all these considerations, we think Cranston has not given adequate attention to the problem of narrowing the terms of its charter to deal with the specific kinds of conflict-of-interest problems it seeks to avoid.

We also do not find convincing the arguments that after-hours campaigning will drain the energy of the public employee to the extent that he is incapable of performing his job effectively and that inevitable on-the-job campaigning and discussion of his candidacy will disrupt the work of others. Although it is indisputable that the city has a compelling interest in the performance of official work, the exclusion is not well-tailored to effectuate that interest. Pre-

---

18. *See* Stack v. Adams, 315 F.Supp. 1295 (N.D.Fla.1970) where the court struck down a similar provision because it added a qualification to run for the national Congress, in violation of Article I, Section 2 of the United States Constitution.

*Cf.* Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). *See also* Storer v. Brown (N.D.Cal. Sept. 8, 1972), prob. juris. noted, 410 U.S. 965, 93 S.Ct. 1441, 35 L.Ed.2d 700 (U.S.Mar. 5, 1973).

sumably the city could fire the individual if he clearly shirks his employment responsibilities or disrupts the work of others. Also, the efficiency rationale common to both arguments is significantly underinclusive. It applies equally well to a number of non-political, extracurricular activities that are not prohibited by the Cranston charter. Finally, the connection between after-hours campaigning and the state interest seems tenuous; in many cases a public employee would be able to campaign aggressively and still continue to do his job well.

Since § 14.09(c) of the Cranston charter is not necessary to further any compelling state interest, it cannot be upheld under the equal protection clause. The judgment of the District Court is affirmed insofar as the District Court granted relief against § 14.09(c) of the charter and part 3(c) of Civil Service Rule X.

CAMPBELL, Circuit Judge (dissenting).

I respectfully dissent from the Court's opinion.

I am completely unable to see how the plaintiff, a police officer, can be said to have been denied equal protection of the law as against persons not in the classified service of the City of Cranston. The City (as I believe my brothers would concede) had a legitimate interest, even a compelling one, in keeping its law enforcement personnel (at least) out of local politics. Thus, given the nature of his office, he was not improperly

treated. That other civil servants holding less sensitive offices may have a stronger case (the point largely relied upon by the court) seems wholly irrelevant to the issue here, which is simply whether or not this plaintiff was denied rights guaranteed to him by the Constitution.

This is not a case of irrational *under*-inclusiveness—as it would be, for example, had uniformed police been barred from candidacy but detectives allowed to run. *See* Police Department of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); Grayned v. City of Rockland, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L. Ed. 1655 (1942). Being placed in a class drawn so as to exclude others similarly situated would be a denial of equal protection since one is subjected to burdens from which others are irrationally excused.

But it does not necessarily follow that being placed in a class which may also include persons *not* identically situated, gives one constitutional cause for complaint. The others' misfortune may, as here, constitute no conceivable unfairness to the person legitimately classified.[1] Plaintiff (and what might be considered his sub-class, law enforcement personnel) would seem to have no right to a windfall simply because we speculate that others within the classified service (librarians, if any, etc.) might have better reason to object to being barred from politics. I do not see how their hypothetical complaints— which are not before us—demonstrate

[1] I do not say that overinclusion, particularly if coupled with a definition of a simple class which is patently objectionable, may never give rise to an equal protection attack by one otherwise subject to appropriate regulation. Here, however, we are dealing with a very complex overall class made up of numerous sub-classes of employees each of which has its own unique position. I do not think that judicial analysis in one fell swoop, in a case

which shows no impropriety in plaintiff's classification, is either necessary or desirable, since it places us in a position of deciding issues which have not been fully aired by interested parties. I believe that a court should resolve constitutional questions only to the extent necessary to deal with the rights of the real litigants before it. I think that this is a particularly unfortunate case in which to resolve the broad issues considered by the majority.

that plaintiff was in any respect denied equal protection.[2]

In Collins v. Texas, 223 U.S. 288, 295–296, 32 S.Ct. 286, 288, 56 L.Ed. 439 (1912), where an unregistered osteopath challenged state registration laws for doctors, Mr. Justice Holmes said, "On these facts we are of the opinion that the plaintiff in error fails to show that the statute inflicts any wrong upon him contrary to the 14th Amendment. . . . If he has not suffered, we are not called upon to speculate upon other cases, or to decide whether the followers of Christian Science or other people might in some event [ever] have cause to complain." *See* United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960).

Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) is likewise a case of arbitrary *under*inclusiveness (contraception could not be denied to the single but allowed to the married). Baird's being allowed to raise the rights of the unmarried raises a different issue—analogous to the present plaintiff's right, which I do not question, to raise the rights of those who might vote for him.

Thus I would limit the inquiry to whether a civil servant like the plaintiff can constitutionally be barred by law from seeking political office of the type plaintiff has been seeking; and I would hold that he can be so barred, just as judges may appropriately be barred from politics.

Admittedly if the case is analyzed on First Amendment rather than equal protection grounds, there is precedent for an "overbreadth" approach. To the rule that a plaintiff may not assert the rights of others, *Raines,* above, 362 U.S. at 22, 80 S.Ct. 519 notes the exception in cases of "freedom of speech." Thus a statute burdening freedom of speech may properly be attacked on grounds of overbreadth by one who might be regulated by a more narrowly drawn statute. Goguen v. Smith, 471 F.2d 88 (1st Cir. 1972). The strongest statements that political candidacy may be a First Amendment right are in Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L. Ed.2d 24 (1968). But as recently as Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), the Court has limited its analysis of candidacy restrictions to equal protection grounds. It is by no means yet clear that every restriction on candidacy is such a burden on "freedom of speech" as to warrant First Amendment (much less overbreadth) analysis. Free speech, in its direct and usual sense, is presumed to facilitate the working of free government. I question the majority's implicit assumption that the political candidacy of one in the full-time employ of the taxpayers is entitled to the benefit of the same presumption. Simply because political candidacy has an ultimate effect upon free speech does not mean that it *is* free speech, or that it reflects values which are in all respects indistinguishable.

In the present case, we deal with several interests, all of importance to the working of free government: the right of a citizen to seek office (and of voters to elect him), and the right of the body politic to control, and to ensure the faithfulness, of those in its employ. I see no constitutional reason to exalt the one over the other, and hence I see no reason to favor overbreadth analysis in this situation. By so doing we judicially establish a priority as to which the Constitution is silent.

For the same reason that I do not favor overbreadth analysis, I question application of the "compelling interest" standard. Bullock v. Carter, above, indi-

---

2. I do not, moreover, yet concede the validity of such hypothetical complaints. There are many different job categories in the classified service of the City of Cranston; I think a much better record is necessary before we attempt to decide whether or not the broad candidacy restriction is warranted with respect to the many differing positions. The reason for dealing with plaintiff's, not someone else's, case is that we are not well informed as to the latter.

cates that that standard is applicable where an invidious economic burden is placed upon an otherwise qualified candidate. It does not go so far as to apply the standard to non-invidious restrictions based upon reasonable civic notions of eliminating politics from the civil service.[3]

Here, the compelling standard is immaterial so long as we focus upon plaintiff's case; even under that test, the City was plainly warranted in restricting the candidacy of police officers. Yet my brothers are assisted by one aspect of the standard when they come to deal with the putative "others" within the class—non-law enforcement officers. They argue that since the challenged legislation can stand only to the extent there is a "compelling interest", the City must follow the least restrictive alternative when regulating all its civil servants. I would hold, instead, that normal equal protection analysis, based upon determining whether or not the charter provision has a rational basis, should be applied.

I would reverse the decision of the district court and dismiss the complaint.

3. I have not attempted to discuss the many reasons which can be advanced to support the statute in issue. I think it not entirely beside the point that the federal Hatch Act was sustained twenty-five years ago. United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). Its validity (and that of certain similar state legislation) are again under attack and will soon be re-determined. *See* National Ass'n of Letter Car. v. United States C. S. Com'n, 346 F.Supp. 578 (D.D.C.1972); review granted, 409 U.S. 1058, 93 S.Ct. 560, 34 L.Ed.2d 510 (1972). The decision in the latter case seems likely to control what we do here. I see no small principle at stake: the right of the citizens and taxpayers to attempt to deal as best they can with the frustrating and difficult problem of how to regulate and control those who, ostensibly, "serve" them (and whose salaries they pay). Many issues are involved: the possible conflict of interest between one who, for example, teaches at a school and is also on the school board; the impact on fellow civil employees of

one who engages in politics. If one can run, then one should also be able to promote another's candidacy. There are states where the personnel of a state agency customarily spend their time before elections promoting candidates. I seriously doubt the wisdom of judicial decisions removing from the citizenry and their legislatures much of their power to deal practically, if imperfectly, with such matters.

The difficulty of judicial intervention in this field is suggested in Broadrick v. Oklahoma State Personnel Board, 338 F. Supp. 711 (W.D.Okl.1972), review granted, 409 U.S. 1058, 93 S.Ct. 550, 34 L.Ed. 2d 510 (1972), where one issue before the Supreme Court is an alleged denial of equal protection because the employees of some but not all state agencies were precluded from political activity. If an attempt is made to reduce the scope of the legislation here in issue, one can foresee further equal protection attacks based upon the argument of arbitrary *under*inclusiveness.